No. 48,802

State of Kansas, *Appellee*, v. Ronald G. Shaffer, *Appellant.*

(574 P.2d 205)

Opinion filed December 10, 1977.

*Hugh R. McCullough,* of Topeka, argued the cause and was on the brief for the appellant.

*Gene M. Olander,* district attorney, argued the cause and *Curt T. Schneider,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

McFarland, J.: This is a direct appeal in a criminal action in which defendant-appellant, Ronald G. Shaffer, was convicted after a trial by jury of first degree murder (K.S.A. 21-3401), aggravated robbery (K.S.A. 21-3427), and unlawful possession of a firearm (K.S.A. 21-4204[1][*b*]).

The evidence reveals that at approximately 7:30 A.M. on February 29, 1976, a customer of the Louk Oil Station in Topeka discovered Donald Becker, a station employee, lying on the floor of the back room of the station. Mr. Becker had been shot in the head but was still breathing and had a definable pulse. Cash and a case of oil were missing from the station. During a search of the scene, officers found an ejector rod from a pistol. An ambulance arrived at 7:51 A.M. and, at that time, Mr. Becker was breathing and had a pulse and blood pressure. Mr. Becker arrived at St. Francis Hospital at 8:28 A.M. The emergency room physician, Dr. Steve Roskos, made a preliminary observation and immediately called Dr. John Runnels, a neurological surgeon, who performed manual tests for signs of life. Dr. Runnels found Mr.

Becker had suffered irretrievable brain damage and advised Dr. Roskos that Mr. Becker could be pronounced dead at any time.

The deceased's mother was told of her son's condition and that he could be maintained by artificial means for an indefinite period. The deceased's family made the decision not to prolong his life by a respirator and to allow the deceased's kidneys to be transplanted. At approximately 11:00 A.M. both kidneys were removed by Dr. John D. Mayer, the respirator was turned off, and all bodily functions ceased. Prior to the removal of the kidneys, Dr. Mayer examined Mr. Becker and determined he was, in fact, dead. The defendant called an expert witness, Dr. John Nichols, who testified more tests should have been given before death was pronounced.

Meanwhile, officers were investigating the crimes. Officers were requested to locate and question former employees of the station. Included in this group was the defendant. Following a lead, officers went to the Ace Motel where they learned defendant was registered. The defendant was not in his room, so the officers parked and waited. Subsequently an unidentified man arrived and went into the room registered to the defendant. The motel clerk was requested to call the room and a man answered the call and the room clerk told him he had rung the wrong room. The officers decided to stop the man when he left the room and see if it was Shaffer. Shortly thereafter, the man left the room and drove away. The officers followed and stopped him after a few blocks. The defendant was driving and produced identification on request. A female occupant was on the passenger's side. An officer saw the woman lean across the seat as he talked to her. About a foot below her hand, he saw the grip of a gun protruding from under the driver's seat. He removed the object which was a Rohm R G 10 revolver, .22 caliber. The gun had a missing ejector rod. The defendant was advised of his rights, refused to talk to officers without an attorney, and was arrested. He was later charged with the crimes of which he was subsequently convicted.

On appeal the defendant claims error on the following grounds: (1) instructing the jury on the terms of K.S.A. 1976 Supp. 77-202; (2) admission of the revolver taken from defendant's automobile; (3) failure to grant a mistrial after the officer testified on defendant's refusal to talk; (4) K.S.A. 1976 Supp. 77-202 is unconstitutionally vague when applied to a murder

charge by allowing two separate standards to be applied to the single phenomenon of death; and (5) K.S.A. 1976 Supp. 77-202 is unconstitutionally vague for absence of specifically enumerated criteria.

The defendant contends K.S.A. 1976 Supp. 77-202 was never intended to apply to criminal homicide trials and that the instruction given pursuant to same was, accordingly, erroneous. K.S.A. 1976 Supp. 77-202 provides:

"**Definition of Death.** A person will be considered medically and legally dead if, in the opinion of a physician, based on ordinary standards of medical practice, there is the absence of spontaneous respiratory and cardiac function and, because of the disease or condition which caused, directly or indirectly, these functions to cease, or because of the passage of time since these functions ceased, attempts at resuscitation are considered hopeless; and, in this event, death will have occurred at the time these functions ceased; or

"A person will be considered medically and legally dead if, in the opinion of a physician, based on ordinary standards of medical practice, there is the absence of spontaneous brain function; and if based on ordinary standards of medical practice, during reasonable attempts to either maintain or restore spontaneous circulatory or respiratory function in the absence of aforesaid brain function, it appears that further attempts at resuscitation or supportive maintenance will not succeed, death will have occurred at the time when these conditions first coincide. Death is to be pronounced before artificial means of supporting respiratory and circulatory function are terminated and before any vital organ is removed for purposes of transplantation.

"These alternative definitions of death are to be utilized for all purposes in this state, including the trials of civil and criminal cases, any laws to the contrary notwithstanding."

The defendant does not contend the instruction given improperly states the statute. The instruction is in the words of the statute as follows:

Instruction No. 5

"You are further instructed that in the State of Kansas the definition of death is: A person will be considered medically and legally dead if, in the opinion of a physician, based on ordinary standards of medical practice, there is the absence of spontaneous respiratory and cardiac function and, because of the disease or condition which caused, directly or indirectly, these functions to cease, or because of the passage of time since these functions ceased, attempts at resuscitation are considered hopeless; and, in this event, death will have occurred at the time these functions ceased; or

"A person will be considered medically and legally dead if, in the opinion of a physician, based on ordinary standards of medical practice, there is the absence of spontaneous brain function; and if based on ordinary standards of medical practice, during reasonable attempts to either maintain or restore spontaneous circulatory or respiratory function in the absence of aforesaid brain function, it

appears that further attempts at resuscitation or supportive maintenance will not succeed, death will have occurred at the time when these conditions first coincide. Death is to be pronounced before artificial means of supporting respiratory and circulatory function are terminated and before any vital organ is removed for purposes of transplantation.

"These alternative definitions of death are to be utilized for all purposes in this state, including the trials of civil and criminal cases, any laws to the contrary notwithstanding."

Rather, defendant contends the statute does not apply to criminal homicide cases and no instruction on the statute should have been given. This contention is without merit. The legislation was entitled, "AN ACT relating to and defining death" (1970 Kan. Sess. Laws, Ch. 378). The last sentence clearly states it is to be utilized "for all purposes in this state, including the trials of civil and criminal cases, any laws to the contrary notwithstanding." There is no ambiguity as to legislative intent.

The defendant next contends the pistol should not have been admitted into evidence. The parties agree that the key question to be answered on this issue is whether or not the officer who seized the handgun from defendant's automobile was lawfully entitled to be where he was at the time of the seizure. A number of officers were assigned to investigate the death of Mr. Becker during an apparent robbery of the service station where he was employed. There were no known witnesses to the crimes. As a part of the investigative procedures, several former employees of the station were to be located and questioned. The defendant was a former employee of the station and officers were assigned to locate him for questioning. There is no evidence defendant was a suspect at the time. He did not become a suspect nor was he arrested until the gun was observed and seized. If the officer had a right to be where he was at the time the gun was observed, the "plain-view" doctrine applies and the gun could be seized without a warrant. The defendant argues the officers should have stopped him when he was first seen and not waited until he had returned to the car and driven away. No authority has been cited for this "duty-to-immediately-pounce-on" theory. It was proper police procedure to question former employees under the circumstances. The police had a right to do so. There is no requirement the defendant had to be out of a vehicle before he was stopped. The defendant was asked for a driver's license before the gun was viewed. He did not have a license with him. This failure to have a license

with him was a violation of K.S.A. 8-244, but is not crucial in this case. The vehicle was lawfully stopped and the officer viewing the gun had a right to be where he was. The admission of the gun is held to be proper. This precise question has not previously been before this court, but this holding is consistent with *State v. Holthaus,* 222 Kan. 361, 564 P.2d 542; *State v. Boone,* 220 Kan. 758, 556 P.2d 864; and *State v. Frizzell,* 207 Kan. 393, 485 P.2d 160.

The defendant next claims the trial court erred in failing to grant a mistrial following the prosecutor's questioning as to defendant's exercise of his right to remain silent at the time of his arrest. The only testimony in this regard came from direct examination of Trooper Buffin as follows:

"Q.  All right, and after seeing the gun and noticing the extractor rod missing, what, if anything, did you do?

"A.  At that point I turned to Mr. Shaffer once again and advised him that I wanted him to listen to me carefully, that I was going to advise him of his rights. I advised him of his rights. After I completed, I asked him, 'Do you understand what I just told you?' Mr. Shaffer replied, 'Yes, he did.' And I then asked, 'Now that you have advised me you understand your rights, will you talk to me at this time?' Shaffer replied, 'No'. And to clarify this, I said, 'Do you mean, no, you won't talk to me?' He said, he replied, 'No, not without a lawyer.' "

The defendant then moved for a mistrial, which was overruled. No further mention was made of defendant's rights and no comment was made by the prosecutor. In the case at hand the defendant did not testify. The testimony objected to is not an attempt to impeach defendant's testimony by showing his post-arrest silence as prohibited in *Doyle v. Ohio,* 426 U.S. 610, 49 L.Ed.2d 91, 96 S.Ct. 2240 and *State v. Heath,* 222 Kan. 50, 563 P.2d 418. The testimony of the officer was just a recitation of what happened after the officer looked at the gun and saw the extractor [ejector] rod was missing. The officer read the defendant his rights, made sure he understood them, asked if he wanted to talk, and defendant said no, not without a lawyer. The court finds no error under the circumstances herein.

The defendant's next point is that K.S.A. 1976 Supp. 77-202, when applied to murder in the first degree, as defining an essential element of the crime is unconstitutionally vague by allowing either of two separate standards to be applied to the single phenomenon of death. The two standards are essentially (1) cardiac-respiratory death and (2) brain death. Until relatively

recently the standards of death were primarily based on respiratory-cardiac functions, *i.e.,* breathing and heartbeat. Modern science has developed equipment that artificially sustains these functions after the body is unable to do so. The *Karen Ann Quinlan* case received national publicity and focused attention on the dilemma of the newly created problems in the field. Theoretically a person pronounced medically dead by all tests could be kept "alive" by artificial means indefinitely. The increasing number of organ transplant operations complicates the situation further as organs such as kidneys may become too damaged for transplant within five minutes after respiration ceases. So for kidney transplants, respiration must continue almost uninterrupted until the kidney is removed.

Kansas was the first state to enact a statutory definition of death (K.S.A. 1976 Supp. 77-202). Accordingly, the Kansas act has been widely praised and criticized. By providing the brain death alternative, it recognizes the fact that modern science has developed equipment that makes the traditional cardiac-respiratory test obsolete as the only test. The alternative test is based on practical medical considerations in keeping with advanced medical technology. This constitutional point is found to be without merit. There is no constitutional requirement that a single standard be used. In fact the cardiac-respiratory test, itself, involves two bodily functions.

The defendant's final point is that K.S.A. 1976 Supp. 77-202 is unconstitutionally vague for failure to enumerate procedures for determining when death has occurred, but leaves the determination to be based on the "ordinary standards of medical practice." There is disagreement within the medical profession as to exactly what tests should be employed to determine death. This, of course, is not unusual within that profession. Three different physicians independently examined the deceased before the transplant removal operation. The neurosurgeon and the surgeon independently concluded irretrievable brain damage had occurred and the patient was dead. The defendant argued to the jury that death was caused by the operation. An instruction was given to the jury on this theory as follows:

### Instruction No. 2a

"With regard to Count I of the information, one of the theories of the defense herein is that the kidney transplant was the cause of the death of Donald W. Becker and not the gun shot [*sic*] wounds to the head. You are instructed in this

regard that if you find defendant did cause the wounds to be inflicted on the person of Donald W. Becker then you must determine whether the act of defendant contributed to the death of Donald W. Becker. If you find defendant's acts contributed to the death of Donald W. Becker then responsibility cannot be avoided by the fact that independent causes such as the negligence of others also contributed to the death. However, if you find the cause of death resulted solely from erroneous treatment by the physicians you must acquit defendant of the offense charged in Count I."

The defendant introduced expert evidence on his theory of insufficient testing. The instruction given is a proper statement of the applicable law. Where a person inflicts upon another a wound which is calculated to endanger or destroy life, it is not a defense to a charge of homicide that the alleged victim's death was contributed to or caused by the negligence of the attending physicians or surgeons. See *State v. Rueckert*, 221 Kan. 727, Syl. 9, 561 P.2d 850.

"Ordinary standards of medical practice" change as medical knowledge and technology improve. Under the instructions given in this case, it was for the jury to determine whether the medical standards required by K.S.A. 1976 Supp. 77-202 had been met. Much of the testimony presented at trial went to this very point. The attack on the statute for failure to specifically enumerate criteria is held to be without merit.

The judgment is affirmed.