No. 85,244

STATE OF KANSAS, *Appellee*, v. COREY R. GHOLSTON, *Appellant*.

(35 P.3d 868)

Opinion filed December 7, 2001.

*Randall L. Hodgkinson,* deputy appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the briefs for appellant.

*Debra S. Peterson,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellant.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his conviction of premeditated first-degree murder, an off-grid felony, and his hard 40 sentence, claiming that (1) the evidence was insufficient to conclude that the victim died as a result of the shooting and (2) his right to confrontation was violated by admitting audiotapes into evidence without

playing them before the jury. He further claims that the trial court erred by (1) admitting autopsy photographs, (2) admitting gang evidence without a limiting instruction, (3) failing to give an informant instruction, (4) failing to give an accomplice instruction, (5) allowing prosecutorial misconduct in closing argument, (6) committing cumulative trial errors, and (7) imposing the hard 40 sentence. Finally, he contends that the hard 40 sentencing provisions violate the Sixth and Fourteenth Amendments to the Constitution.

On October 4, 1995, at approximately 11:30 pm, Tiamesha Bell and her 2-year-old daughter, Brentashia, Debra McDonald, and Deandre Parker drove to a QuikTrip convenience store so McDonald could make a telephone call and Bell could shop. Parker, a member of a gang known as the Second Street gang, remained in the car with Brentashia.

While Bell was in the store and McDonald was using a telephone outside the store, several gunshots were fired in the parking lot and into the car where Parker and Brentashia were waiting. Two shots struck Parker in the arm. One shot struck Brentashia, entering the back of her head and exiting the front. The wounded Parker left Bell and McDonald and immediately drove to a hospital to get help for Brentashia.

Wichita police officer Steve Martin encountered Parker in the parking lot of Wesley Hospital. Parker exited his car and ran through the parking lot screaming hysterically, "I can't believe they shot that baby. The motherfuckers shot that baby. I can't believe they shot my baby." While striking himself on the head, Parker shouted, "Just kill me, just kill me."

Officer Martin, concerned that a baby was in jeopardy, opened the front passenger door of Parker's car and found Brentashia on the floorboard. Brentashia appeared to have an exit wound to the forehead. Although brain matter was oozing from the center of her forehead, the child was breathing. Hospital emergency personnel administered emergency care and placed the child on life-support.

The child's mother arrived a short time later. After consulting with the doctors as to her child's condition, the mother made the

decision to "unplug" all the life support mechanisms attached to her child. Two-year-old Brentashia ceased to breathe.

No one identified the shooter for several years. Detective Michael Hennessy of the Wichita Police Department continued to pursue leads in the case. Among the suspects investigated by Hennessy was the defendant, Corey Gholston.

Gholston was a member of the Neighborhood Crips, a rival gang of Second Street. The investigation led to two witnesses, Kim Berger and Tiara Carolina. The witnesses informed the investigating officer that on the night of the shooting, they had been drinking heavily. They picked up Gholston and another man (the identity of the second man is unclear) in a stolen white van. The group went to the QuikTrip to buy blunt sticks (cigars hollowed out and filled with marijuana). When they arrived at the QuikTrip, they saw a rival gang member (Parker) sitting in a car in the parking lot. Berger drove the van around the QuikTrip and parked on a side street because she was either wary of a confrontation with a rival gang member or Gholston had instructed her to do so.

Gholston, the only one in the group old enough to legally buy tobacco products, exited the van to buy the cigars. When Gholston was a short distance from the parked van, shots rang out. Gholston ran back to the van. The van and all the cars at the QuikTrip quickly sped from the scene.

The witnesses' stories differ as to whether Gholston ran from his position in the parking lot before the gunshots stopped or after they stopped. Accounts also differ as to whether Gholston had a gun. There were rumors that after the shooting, Gholston broke a gun in pieces and buried it in an alley.

Antonio Presley, who was incarcerated with Gholston on another matter, told Officer Hennessy that Gholston was remorseful about shooting and killing a baby. In an interview with Kim Berger, Berger stated to Hennessy that Gholston expressed sorrow to her regarding the shooting.

More than 4 years after the shooting, Gholston was charged with the murder of Brentashia. Gholston's first trial resulted in a mistrial when the jurors were unable to agree on a verdict. A second jury trial resulted in Gholston's conviction of premeditated first-degree

murder. Gholston was sentenced to the hard 40. He appeals both his conviction and sentence, raising numerous issues.

## Evidence of Cause of Death

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000). While the State must sustain its burden of proof on each element of an offense charged, some of these elements may be proved by circumstantial evidence and the logical inferences therefrom. *State v. Wilkins*, 269 Kan. 256, 267, 7 P.3d 252 (1999), (quoting *State v. Harper*, 235 Kan. 825, 831, 685 P.2d 850 [1984]).

For reasons unknown, the State introduced no medical evidence at trial that Brentashia was brain dead when her mother authorized the Wesley medical personnel to discontinue life-support measures. Gholston asserts that under the circumstances, the cause of the child's death was a question of fact for the jury to determine. Gholston contends that because there was no medical evidence establishing that Brentashia was brain-dead before life support was withdrawn, this court must declare, as a matter of law, that the decision to terminate life support was or could have been a superseding cause of Brentashia's death. According to Gholston, because (1) the trial court failed to instruct the jury on the element of causation and (2) there was substantial evidence upon which a jury could have concluded that the termination of life-support was the superseding cause of Brentashia's death, his conviction must be reversed.

The State contends that lack of evidence regarding the legal status of death is not reversible error. The State cites the Arizona case of *State v. Fierro*, 124 Ariz. 182, 603 P.2d 74 (1979), for support. The State's reliance on *Fierro* is flawed because in that case there was medical evidence that the victim was brain dead before the termination of life support, and, unlike Arizona, Kansas has a statutory definition of death.

For support, Gholston relies on K.S.A. 77-205 and *State v. Shaffer*, 223 Kan. 244, 574 P.2d 205 (1977).

K.S.A. 77-205 provides:

"An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards."

In *Shaffer*, the evidence revealed that at approximately 7:30 a.m. on February 29, 1976, a customer of the Louk Oil Station in Topeka discovered Donald Becker, a station employee, lying on the floor of the back room of the station. Becker had been shot in the head but was still breathing and had a definable pulse. Cash and a case of oil were missing from the station. An ambulance arrived at 7:51 a.m. and, at that time, Becker was breathing and had a pulse and blood pressure. Becker arrived at St. Francis Hospital at 8:28 a.m. The emergency room physician made a preliminary observation and immediately called a neurological surgeon, who performed manual tests for signs of life. The neurologist determined Becker had suffered irretrievable brain damage and advised the emergency room physician that Becker could be pronounced dead at any time.

Becker's mother was told her son was brain dead and that his body could be maintained by artificial means for an indefinite period. Becker's family made the decision not to prolong his life by a respirator and to allow his kidneys to be transplanted. Prior to the removal of the kidneys, a doctor examined Becker and determined Becker was, in fact, brain dead. At approximately 11 a.m., both kidneys were removed and the respirator was turned off. All bodily functions ceased.

At trial, the defendant called an expert witness who testified that more tests should have been given before death was pronounced. The defendant then argued to the jury that there was evidence that Becker's death was caused by the subsequent removal of the victim's kidneys, not the gunshot wound to the head. The defendant also asserted that the Kansas statutory definition of death was unconstitutionally vague because it allowed either of two separate

standards, *i.e.*, (1) irreversible cessation of circulatory and respiratory functions or (2) irreversible cessation of all functions of the entire brain, including the brain stem. The *Shaffer* court rejected that claim and found that determinations made upon "ordinary standards of medical practice," the standard included in the definition of death statute, K.S.A. 77-202 (Weeks), was sufficient to satisfy constitutional standards. 223 Kan. at 249-50.

The *Shaffer* court then noted that three medical professionals had independently examined the victim and determined that he was dead prior to removal of organs necessary for the transplant operation. The court observed that K.S.A. 77-202 (Weeks) contained the following sentence: "These alternative definitions of death are to be utilized for all purposes in this state, including the trials of civil and criminal cases, and any laws to the contrary notwithstanding." 223 Kan. at 246. In 1984, the legislature repealed K.S.A. 77-202 (Weeks) and enacted the current statute, K.S.A. 77-205, which does not contain the sentence quoted.

The *Shaffer* court concluded by noting that Kansas was the first state to enact a statutory definition of death (K.S.A. 1976 Supp. 77-202). 223 Kan. at 249. Accordingly, the Kansas Act has been widely praised and criticized. By providing the brain death alternative, it recognizes the fact that modern science has developed equipment that makes the traditional cardiac-respiratory test obsolete as the only test. The alternative test is based on practical medical considerations in keeping with advanced medical technology. The *Shaffer* court concluded that the defendant's constitutional point was without merit and found that there is no constitutional requirement that a single standard be used. 223 Kan. at 249.

Gholston argues that *Shaffer* requires medical evidence to establish the cause of death in a criminal trial, and because no evidence as to the cause of death was presented by the State at his trial, the evidence is insufficient to conclude that Brentashia was legally dead from a gunshot wound at the time life-support measures were terminated. We disagree.

While K.S.A. 77-205 provides the legal definition of death, and it is standard practice to include evidence satisfying the legal def-

inition of death at trial, the lack of evidence specifically satisfying that definition under some circumstances does not create an issue of whether death was caused by the criminal act of the defendant or by a superseding incident.

The evidence presented at Gholston's trial was indisputable. Someone fired a gun that resulted in Brentashia being shot in the head. A photograph introduced into evidence shows the entrance wound was in the back of her head, and the exit wound, which is larger than the child's eyes, was between the child's two eyes and slightly above her eyebrows. In addition to the photograph, two law enforcement officials who observed Brentashia shortly after the shooting noted "brain matter oozing" and blood "rushing" from the exit wound.

Brentashia's mother, who was with Brentashia in the hospital after the shooting, when asked at trial whether Brentashia was alive at that time, responded, "To be honest, I don't think so." Gregory Burge, a crime scene investigator, took pictures at the hospital and the morgue to make a photographic record of the injuries that led to Brentashia's death. Burge tagged Brentashia's body on October 7, 1995, 1:38 p.m., and attended the autopsy the next day. Burge testified, without objection, that Brentashia died of a gunshot wound.

At trial, Gholston did not challenge the fact that Brentashia's death was caused by a gunshot wound. Gholston presented no evidence suggesting there was a superseding cause of death. There is no evidence that Brentashia's organs were harvested or that her life was terminated to facilitate the surgery to remove the organs. The only issue raised at trial was the identity of the shooter. There was no dispute that Brentashia sustained gunshot wounds to her head.

We refer again to *Shaffer*. During Shaffer's trial, Shaffer argued to the jury that Becker's death was not caused by the gunshot, but it was caused by the operation and removal·of the kidney. The following instruction was given the jury:

" 'With regard to Count I of the information, one of the theories of the defense herein is that the kidney transplant was the cause of the death of Donald W. Becker and not the gun shot [sic] wounds to the head. You are instructed in this

regard that if you find defendant did cause the wounds to be inflicted on the person of Donald W. Becker then you must determine whether the act of defendant contributed to the death of Donald W. Becker. If you find defendant's acts contributed to the death of Donald W. Becker then responsibility cannot be avoided by the fact that independent causes such as the negligence of others also contributed to the death. However, if you find the cause of death resulted solely from erroneous treatment by the physicians you must acquit defendant of the offense charged in Count I.' " *Shaffer*, 223 Kan. at 249-50.

The *Shaffer* court noted that the defendant introduced expert evidence on his theory of insufficient testing to determine the cause and time of death. The court observed that where a person inflicts upon another a wound which is calculated to endanger or destroy life, it is not a defense to a charge of homicide that the alleged victim's death was contributed to or caused by the negligence of the attending physicians or surgeons. It concluded that under these circumstances the instruction given was a proper statement of the applicable law. 223 Kan. at 250.

Viewing the evidence in a light most favorable to the State, the evidence presented at trial was sufficient for the jury to find that Gholston fired the gun that caused the wound to Brentashia's head. Under the circumstances, even though the child was breathing and had a pulse before taken off life support, Gholston is responsible for the child's death because he inflicted the wound that caused or contributed to the child's death. Gholston's claim there was a superseding cause of death fails.

### Right to Confrontation

Gholston contends reversible error was committed when audiotapes were admitted into evidence without previously being played before the jury in open court. Gholston asserts this procedure violated the United States Constitution's Confrontation Clause. For support, Gholston relies on *State v. Brockenshire*, 26 Kan. App. 2d 902, 912, 995 P.2d 905 (2000).

In *Brockenshire*, tape recordings of drug transactions without a proper foundation were admitted into evidence. The tapes were not played in open court. The jury listened to the tapes during its deliberations. The defendant had objected to sending the tape for jury consideration without playing it in open court. On appeal,

Brockenshire claimed violation of several rights including his Sixth Amendment right to confront evidence and witnesses against him. The *Brockenshire* court held that the improper admission of the tapes and defendant's lack of opportunity to confront the evidence in the presence of the jury contravened his Sixth Amendment right of confrontation. 26 Kan. App. 2d at 912. The *Brockenshire* court then analyzed the issue under the federal constitutional error rule, found reversible error, and granted Brockenshire a new trial.

Here, Gholston's defense counsel objected to the admission of the tapes as hearsay rather than lack of foundation. In fact, after extensive questions to the witnesses pointing out inconsistencies between the contents of their taped interviews with Hennessy and their testimony in court, the judge encouraged the defense counsel to play the tapes in open court. After defense counsel declined the invitation to do so, the judge stated: "If we're going to go through this [extensive cross-examination], let's just play the tape." Defense counsel replied:

"It's not entirely on the tape. A lot of the things are not on the tape. There's some comments I'm making on this, and this is the only opportunity I'm going to get to cross-examine the matter that is on the tape, and that's not the only matter I have to do that."

The judge responded: "But you're not cross-examining this witness. You're simply asking him what's on the tape." Defense counsel answered, "Well, that's true to some extent, but a lot of it is intended to simply impeach evidence that came about through Kim Berger, Tiara Carolina, Ron Snyder." The judge informed defense counsel that she would allow the cross-examination without playing the tape, if defense counsel ceased going line by line through the interviews. Defense counsel agreed, and the cross-examination continued.

During cross-examination, defense counsel pointed out to the jury many inconsistencies on the tapes and contradictions between statements made by the witnesses on the tapes and statements made by those witnesses at trial. At the end of his cross-examination of the State's witnesses, defense counsel said, "Your Honor, conditioned on the Court's ruling on [my objections to the admis-

sion of the content of] these tapes and one additional tape, I don't have any more evidence." The "additional tape" alluded to by defense counsel was a taped interview between a State's witness, Kim Berger, and defense counsel. Defense counsel made a particular objection to some prejudicial information on a taped statement made by one of the State's witnesses, Antonio Presley. The judge then stated that they would discuss counsel's objections to the tapes off the record.

The next morning, before reconvening the jury, the judge stated to the parties:

"When we left yesterday, we had — we went back in chambers, and then we had discussed also in court the admissibility of the tapes. That would be Exhibit 25 — that's Mr. Presley's taped statement. I understand, Mr. Kaufman, that you have redacted that pursuant to the request made of you by Mr. Svoboda; is that correct?

"MR. KAUFMAN [Prosecutor]: Yes. Specifically Mr. Svoboda and I spent about 20 minutes last night after court adjourned. He and I went over the transcript of Mr. Presley page for page, and we agreed on specific sections to be redacted. That occurred, and I will also submit a clean copy of the transcript which reflects those areas upon which we agreed pursuant to the redaction, and so I have the redacted tape with me in court today.

"THE COURT: Thank you. And, of course, by making the request for the redactions, Mr. Svoboda, I do note that you do have a standing objection to that, and you've made your argument about why that should not be admitted and that you're not actually conceding that it is admissible in your viewpoint.

"MR. SVOBODA [Defense counsel]: That's correct, Judge. And not only the tape involving Antonio Presley; I also object to the admissibility of the tapes regarding Kim Berger, Tiara Carolina.

"As the Court is aware, I have filed a memorandum in opposition to admission into evidence of those tapes. I think the Court had indicated that there was going to be — that it would be a part of the record, or would you prefer that I file that, Judge, with the clerk?

"THE COURT: I've got it right here. We'll show it filed with the Court, and it will go along with the file and become a part of the court file. All right.

"MR. SVOBODA: And I also, Judge — Mr. Kaufman and I have discussed the introduction of the tape that we have concerning Kim Berger's interview with my detective and myself. We understand this Court's ruling is going to be admissibility of the tapes. I have discussed with Mr. Kaufman a stipulation to foundation, simply for that purpose, retaining my objection on purposes of admissibility."

The judge ruled:

"THE COURT: All right. Pursuant to my ruling yesterday, I am finding that the redacted statement, Exhibit Number 25, is admissible.

"I find that the tape that was offered yesterday afternoon of Kim Berger with Detective Hennessy will be admissible as well as the taped interview between Mr. Svoboda and Ms. Berger, which has been marked as number 34. That has not been offered yet in front of the jury yet.

"MR. KAUFMAN: Correct.

"THE COURT: The tape of Tiara Carolina's interview, Exhibit Number 37, is admissible, and Defendant's Exhibit A [tape of interview between Svoboda and Berger] is admissible as well. I will admit them in front of the jury."

The judge admitted the tapes when the trial reconvened. When admitting the tapes, the judge reiterated that the prosecutor and the defense had stipulated to foundation, explaining to the jury that the defense would not require that a witness take the stand to authenticate the tape. The judge stated, "[Gholston's] admitting that [the tapes are] authentic, and that's what that [stipulation] is."

At trial, the State's witnesses were vague in their recollections and no witness unequivocally implicated Gholston as the shooter. The tapes, however, do contain statements that directly implicate Gholston in the shooting, identifying him as the shooter and attributing statements to Gholston where Gholston showed remorse for killing the baby. The tapes, therefore, were important to the prosecution because they contained the primary evidence against Gholston. Defense counsel was allowed to energetically and exhaustively impeach the tapes by confronting the witnesses with inconsistencies between the taped interviews and their testimony at trial. Several of the witnesses testified that they implicated Gholston in the taped interviews because Hennessy coerced them by threats to pursue criminal charges against the witnesses for their roles in the shooting.

We find that this case is distinguishable from *Brockenshire*. Here, the defense stipulated to the foundation for the tapes, and the judge, on numerous occasions, offered to play the tapes in open court and the defense attorney declined to do so. Under these circumstances, the trial court did not err in admitting the tapes for jury consideration without first playing the tapes in open court.

## Autopsy Photographs

The trial court has broad discretion regarding the admission of demonstrative photographs. To determine whether such photo-

graphs should be admitted, a trial court must decide whether they are relevant and whether a proper foundation has been laid. *State v. Roberts*, 261 Kan. 320, 329, 931 P.2d 683 (1997).

Over defense objection, the trial court admitted photographs of the child in the hospital connected to life support equipment and the autopsy photo depicting the child's head wound. When admitting the photos into evidence, the trial court stated: "It's not disputed how [Brentashia] died or what the circumstances were that led to [Brentashia's] death. However, this jury has the right to get a complete picture."

Gholston argues that the photographs were irrelevant and inflammatory. Gholston asserts that the photographs were erroneously admitted because there was no disputed fact that the photographs tended to prove and were admitted solely to inflame the emotions of the jury.

It is well established that photographs which serve to illustrate the nature or extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death. *State v. Coyote*, 268 Kan. 726, 737-38, 1 P.3d 836 (2000).

Even where the defendant concedes the cause of death, the prosecutor has the burden to prove all the elements of the crime charged and photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. *State v. Clark*, 261 Kan. 460, 477, 931 P.2d 664 (1997).

The hospital photograph showed Brentashia's forehead bandaged, blood soaking through the bandages and life-support equipment attached to her body. The photograph illustrated the nature and extent of the wound inflicted. It showed the medical attention Brentashia required after being shot. It corroborated the police officers' testimony as to the extent of the injuries they observed upon first seeing Brentashia at the hospital. The first photographs corroborated the testimony of Brentashia's mother about her observations of Brentashia's condition. The second photograph showed the exit wound to Brentashia's forehead. This photograph corroborated the testimony of the police officers who attended the

autopsy. The trial judge did not abuse her discretion in admitting the two photographs.

## Gang Evidence

At trial, over defense objections, the State introduced substantial evidence of gang membership of several parties and witnesses, including Gholston and Parker. Although defense counsel did not request a limiting instruction regarding admission of the gang affiliation evidence, Gholston now argues to this court that the trial court erred by admitting gang evidence without an appropriate limiting instruction. Gholston analogizes the gang evidence to prior bad acts evidence and asserts that the trial judge's failure to give a limiting instruction was clearly erroneous.

No party may assign as error the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 2000 Supp. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Evans,* 270 Kan. 585, Syl. ¶ 3, 17 P.3d 340 (2001).

This court has consistently held that evidence of gang membership is not evidence of a crime or civil wrong under K.S.A. 60-455. Therefore, K.S.A. 60-455 does not apply and no limiting instruction is required. *State v. Jamison,* 269 Kan. 564, 568, 7 P.3d 1204 (2000); see also *State v. Roberts,* 261 Kan. at 326 (where no limiting instruction concerning gang evidence requested, failure to give such an instruction is not clearly erroneous).

Evidence of gang affiliation indicating a defendant is a member of a gang or is involved in gang-related activity is admissible to show a motive for an otherwise inexplicable act. Such evidence, however, is only admissible where there is sufficient proof that such membership or activity is related to the crime charged. *State v. Tran,* 252 Kan. 494, Syl. ¶ 6, 847 P.2d 680 (1993).

Evidence of gang membership pervaded this trial because gang membership was the motive for an otherwise inexplicable act of shooting and killing a child. In addition, after reviewing the record we find that there is no real possibility the jury would have rendered a different verdict if a limiting instruction had been given. The fact that the court did not provide such an instruction was not error.

## Informant Instruction

In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of the trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. *State v. Saleem,* 267 Kan. 100, 113, 977 P.2d 921 (1999).

At trial, Gholston asserted that Berger, Carolina, and Presley were informants and requested that the jury be instructed: "You should consider with caution the testimony of an informant who, in exchange for benefits from the State, offers evidence against a defendant, if that testimony is not supported by other evidence." The trial court did not give the requested instruction; however, the following instruction was given: "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified."

It is important to note that an informant does not include a person who supplies information after being interviewed by police officers or who gives information as a witness during the course of the investigation or someone who contacts law enforcement officials in hopes of obtaining a benefit by supplying information. *State v. Conley,* 270 Kan. 18, 25, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). The crux of the definition of an informant is a person who acts as an agent for the State in procuring information. *State v. Barksdale,* 266 Kan. 498, 514, 973 P.2d 165 (1999). If someone does not meet the definition of an informant, the trial court is not required to give an instruction on informant testimony.

Berger, Carolina, and Presley were witnesses that provided information to the police during investigation interviews. They never acted as agents for the State to procure information against Gholston. At trial, all three witnesses were examined as to their motivation for giving their various statements. In addition, Detective Hennessy was questioned and cross-examined about what he said and did to obtain the statements. The witnesses were not informants; therefore, no informant instruction was required. The trial court did not err in refusing to give the requested instruction.

## Accomplice Instruction

P.I.K Crim. 3d 52.18 instructs the jury: "An accomplice witness is one who testifies that (he)(she) was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice." This instruction was not requested by defense counsel. As a result, failure to give this instruction is reversible only if clearly erroneous. See *State v. Pierce*, 260 Kan. 859, 868, 927 P.2d 929 (1996).

Berger was considered a suspect by law enforcement officers. This was suggested in the tape-recorded statements Berger gave to Hennessy and the fact Berger was considered by the police as an accomplice in the shooting. Berger testified at trial that prior to making her statements to Hennessy that implicated Gholston, Hennessy threatened to prosecute her for her involvement in the commission of the crime.

At trial, Hennessy confirmed that he read Berger her rights before interviewing her. He testified,

"In these type of cases, sometimes we're not quite sure if the person who is talking with us is going to be a suspect or a witness. In this particular case, or some cases, we'd just err on the side of caution and make sure; and since a stolen vehicle was involved and we already had information that she had access to it, there could have been a crime committed by her that she was involved in. Therefore, I felt I should read her her rights."

Hennessy testified that Berger indicated to him that if he thought she was involved in the QuikTrip murder, she wanted an attorney. After getting a little frustrated with Berger's various versions of the incident, Hennessy told Berger, "Do you want to co-

operate or do you want to be charged with murder?" Berger said, "I want to cooperate; I'm scared."

At trial, Berger testified that regarding her initial 1995 interview Hennessy stated that if she did not come in for the interview, the police were going to pick her up as a suspect in the murder. Berger voluntarily came in for the interview. Berger testified, "[Hennessy] asked me a couple questions about some gang members. He asked me about [Gholston]. He asked me my relations with Choc. He asked me my involvement with them; told me that he knew I knew." Berger continued, "[Hennessy] handcuffed me to a table. He had me in there for about four or five hours. He arrested me and took me to YRH for felony car theft. That's basically all he talked to me about." Hennessy told Berger that she was looking at 20 to 25 years for accessory to murder. According to Berger, Hennessy told her that her child would be taken from her. He also told her that somebody told him that Walker (Berger's boyfriend) was the one who committed the murder, and if she did not want Walker to go to jail, she needed to tell the truth. Berger testified that she told Hennessy that she "had no knowledge of who was shooting who or where the gunshots came from, but [she] did take the blame for the [stolen] car."

Berger spoke with Hennessy again in April 1999. Her 1999 taped interview provided the evidence necessary to convict Gholston. Berger testified at trial that in 1999 Hennessy told her that if she cooperated, she would not be charged with accessory to murder.

In *State v. DePriest*, 258 Kan. 596, 907 P.2d 868 (1995), DePriest, Jesse Burton, and another were charged with first-degree murder and conspiracy to commit murder. On appeal, DePriest argued that the trial court should have given an accomplice instruction because Burton was the only witness to DePriest's involvement in the crime. DePriest did not request such an instruction at trial.

The *DePriest* court noted that in determining whether prejudicial error has occurred in the failure to give an accomplice instruction, courts generally look to the extent and importance of the accomplice testimony, as well as any corroborating testimony. 258 Kan. at 605.

In this case, Berger's testimony against Gholston and Burton's testimony in *DePriest* was vitally important because in both cases the testimony linked the defendant to the crime. In *DePriest*, Burton's testimony was partially corroborated by the defendant's admissions and other evidence. 258 Kan. at 605-06. The *DePriest* court did not find reversible error in the failure to give an accomplice instruction, stating:

"As early as 1910, this court stated, in a case where the defendant claimed error for failure to give an accomplice instruction even though none had been requested, that '[w]ithout such an instruction a jury of ordinary intelligence would naturally receive with caution the testimony of a confessed accomplice.' [Citation omitted.]. . . .

. . . .

". . . Because there is corroboration of the accomplice's testimony, and because a jury of ordinary intelligence would naturally receive with caution the testimony of Burton, we conclude that there was no real possibility the jury would have reached a different result had the instruction been given." 258 Kan. at 606.

It should be noted that although Hennessy told Berger that her actions on the night of the shooting could result in the charge of murder as an aider and abettor, there is no evidence that Berger had knowingly associated or participated in the crime. At trial, Berger testified that she asked Gholston to go into the QuikTrip to buy blunt sticks. While Gholston was out of the car, Berger heard gunshots and screamed for him to get back into the car, which he did, and they sped away. In statements to Gholston's attorney, Berger stated that she never saw the gun in the car, she never saw Gholston get out of the car with a gun, and she never saw the gun until she saw Gholston shooting. In a taped interview with Hennessy, Berger stated that she did not know Gholston had a gun until the shooting started.

Under the circumstances, the judge was not required to give an accomplice instruction.

### Prosecutor's Statements

Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. Where prosecutorial statements are not objected to at trial, if the claimed error has been determined to implicate a

defendant's right to a fair trial, our standard of review is the same whether or not an objection was made at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. *State v. Pabst*, 268 Kan. 501, 504, 996 P.2d 321 (2000).

The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error, that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. 268 Kan. 501, Syl. ¶ 3.

Gholston contends the prosecutor in closing argument improperly defined premeditation, appealed to community values, and vouched for State's witnesses. The prosecutor stated:

"Deandre Parker is a gang member, okay? He's a gang member. That is foreign to the 11 of you. You do not live in that element. You are not exposed to that element. But that is the element in this case, and we have to deal with it.

"He is a Second Streeter. That is a rival gang of the Crips. You also know one other fact, uncontested, that prior — before this shooting of Parker by Mr. Gholston on this night, that they'd had at least two run-ins on the street. What they are, we don't know but we know they're enemies and they've met before on the streets.

"One other fact that I will come back to later, it is a very subtle fact, but you have to think about it, and I'll explain it later on. And this is the streets talking.

"Brentashia Smith was a Crip baby. That description is demeaning to her as a human being, as an innocent child, and as a victim of a senseless homicide, but she was a Crip baby. Her father was Brent Smith. He was a Crip.

"Mr. Gholston is a Crip. He killed one of his own. He killed a Crip."

Gholston contends that the prosecutor's reference to gang involvement and his encouragement to have the jury "deal" with it, constitutes improper argument, encouraging the jury to consider facts other than whether the State had proved Gholston guilty of murder.

The prosecutor's references to gang involvement were not, in this case, erroneous. The prosecutor was informing the jurors that gang membership and all of its nuances might be outside their experiences, but it was within the context of this case. Without consideration of the gang evidence and culture, this crime was inexplicable.

Gholston next contends that the following italicized statement by the prosecutor constitutes an improper expression of the prosecutor's personal opinion regarding what evidence should be believed. The State asserts that the statement must be considered in the context of the statement immediately preceding and following it.

"This is not a clean trial. I recognize that. But you've got to look at the evidence. And by the way, Mr. Svoboda, the evidence is everything. You know, this is evidence. This is why you get to listen to it. You know, don't think that evidence is just the witness stand. That's evidence, a tape.

"And when you think about people's testimony and then you listen to the tape, harken back to what I said, that fear is a great motivator when you sit eight feet from a murderer.

"The truth is that Detective Hennessy, who has been a cop for 20 years, was relentless. And he seeks justice. And now it's before you, the truth and justice, and I ask you to end your silence and convict him of a first-degree murder.

"You have a verdict form. I told you I'd come back to the combination theory. If you believe he's not guilty, you just go straight down there and check it not guilty.

"But if you believe he's guilty, if you believe he pulled the trigger, based on the evidence and the law, then you can find him guilty of murder in the first degree. It's a given. You may say murder in the first degree, felony murder. Instantly guilty, no question about it.

"You may think, well, first-degree premeditation, that it was intentional, that he did it with premeditation. You may check that. That's 1B.

"1C is called the combination theory. What that means, just simply put, is if the 11 of you think this man is guilty, but maybe 5 of you think, well, felony murder [is] what he did because I don't think he intentionally killed her and the other 6 say no, it was intentionally killing, transfer of intent. Intent follows the bullet. If 11 agree he's guilty, but you can't decide felony—if it's felony or premeditated but you believe he's guilty, you just say combination. The law permits this. This isn't the State of Kansas talking. This is the Court, Rebecca Pilshaw talking. The combination theory, okay?

"The 11 of you agree that he's guilty but you can't decide which issue, which specific theory it was—

"THE COURT: One minute.

"MR. KAUFFMAN: Thank you, Your Honor.

"And I appreciate your patience. *Take whatever time you need, but seek the truth. The tapes tell you the truth. The truth has been in this courtroom too. Sometime[s] it's not easy to see, and sometimes it's very quiet, but I ask you when you think about it, if all of you will look slightly to your right, the truth is there's your murderer right there. Convict him of it.*" (Emphasis added.)

The trial was fraught with inconsistent witness statements, and there was no physical evidence linking Gholston to the shooting. The defense attorney focused on the inconsistencies in an attempt to create reasonable doubt. The prosecutor admitted the weaknesses in the case and urged the jury to sort out the facts and find that Gholston committed the crime of murder. The prosecutor emphasized the fact-finding role of the jury at the beginning of his closing argument:

"You really have one decision in this case when you look at what the issue is, and this is the decision you need to decide: If you believe based on all the evidence, all the evidence and the law given to you, that Corey Gholston pulled the trigger of that gun that night, you will find him guilty then."

We note that Gholston did not object to the prosecutor's closing argument at trial. To support his claim of prosecutor's misconduct, Gholston relies on *Pabst*, where the prosecutor accused Pabst of lying at least 11 times during closing argument, stating: "The State tells you he lied." 268 Kan. at 505. The defense attorney objected numerous times and moved for a mistrial during the course of the argument. The trial court overruled the defense counsel's objections.

The *Pabst* court concluded that whether couched in terms of the State or the prosecutor, the prosecutor's assertion that Pabst lied was improper. It was also improper for the prosecutor to claim, "We didn't lie to you," in an attempt to bolster the credibility of the State's witnesses. 268 Kan. at 505. The *Pabst* court quoted KRPC 3.4 (2000 Kan. Ct. R. Annot. 389) which states that a lawyer shall not in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or *state a personal opinion* as to

the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused. 268 Kan. at 506. Pabst's conviction was reversed and remanded for a new trial because of prosecutorial misconduct during closing argument. 268 Kan. at 511.

Here, the trial court erred in allowing the prosecutor to state: "[T]he truth is there's your murderer right there." However, given the context of the comment, it was less egregious than the error in Pabst. Here, the conflict was in the State's witnesses' in-court and out-of-court statements. The State admitted its witnesses were less than credible, and it was for the jury to determine what it believed.

The jury instructions explained to the jury that (1) it was to decide the case by applying the instructions to the facts as it found them; (2) statements, arguments, and remarks of counsel were intended to help it in understanding the evidence and in applying the law, but were not evidence; (3) it was for the jury to determine the weight and credit to be given the testimony; (4) the jury must be convinced from the evidence that the defendant was guilty; and (5) the jury's verdict must be founded entirely upon the evidence admitted and the law given in the instructions.

The jury is presumed to have followed its instructions. *State v. Fulton*, 269 Kan. 835, 842, 9 P.3d 18 (2000). Although the prosecutor's remarks on credibility, *i.e.*, it was his belief that the witnesses' statements that implicated Gholston were truthful, was misconduct, under the circumstances the misconduct did not constitute reversible error.

Gholston also contends that the prosecutor's statement regarding the law of premeditation was erroneous and requires reversal of his conviction. For support, Gholston relies on *State v. Moncla*, 262 Kan. 58, 70, 936 P.2d 727 (1997), and *State v. Saleem*, 267 Kan. 100, 977 P.2d 921 (1999), for support. In Moncla, this court held that a jury instruction stating that premeditation "may arise in an instant" was inappropriate because it diminished the importance of the element of premeditation. The Moncla court found although the instruction was erroneous, the evidence was that the victim had been struck in the head 18 times with a hammer after a pillow was placed over her head. The Moncla court noted there

was no evidence of provocation, and the defendant left the scene telling people he was going to work; he instead hid. On these facts, this court concluded that the record contained abundant evidence of premeditation and deliberation. 262 Kan. at 73.

Here, the prosecutor stated:

"Again, do not read any more into definitions than what is given to you. To have thought the matter over beforehand, how long does it take to consider that I'm going to intentionally kill you? (Snaps finger.) It can be that quick. It's not necessarily Hollywood, where we have the weeks of planning and you've all seen those type [of] movies. In the State of Kansas, the law means the law, to have thought the matter over beforehand; and if you believe Gholston pulled the trigger, you know he thought the matter over beforehand."

The State contends that even if the prosecutor erroneously misstated the law, the jury instructions properly apprised the jury of the law.

Here, we are dealing with a prosecutor's comment in closing argument which did not purport to be an abstract statement of the law. The facts are clear—the shooting was premeditated. There is evidence that Gholston, without provocation, got out of the van with a gun, aimed the gun at a rival gang member's car, and fired a volley of bullets into the car killing Brentashia. Under the circumstances, the prosecutor's statement was not reversible error.

### Cumulative Errors

Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Bedford*, 269 Kan. 315, 332-33, 7 P.3d 224 (2000).

Gholston contends that cumulative trial errors require this court to reverse his conviction. We have reviewed the record and have determined that this issue has no merit.

### Imposition of the Hard 40

Where the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 40

sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence. *State v. Murillo*, 269 Kan. 281, 287-88, 7 P.3d 264 (2000).

After finding as an aggravating circumstance that Gholston knowingly or purposefully created a great risk of death to more than one person when he fired a semi-automatic weapon across the QuikTrip parking lot into a parked car, the trial court imposed the hard 40 sentence.

Gholston contends to this court that because there was no evidence the shooter saw more than one person when he pulled the trigger, there is no evidence that the shooter knowingly or purposefully created a great risk of death to more than one person.

We disagree with Gholston's statement of the facts. The evidence was that the white van in which Gholston was a passenger first pulled up into the parking lot of the QuikTrip. Seeing a crowd in the parking lot, someone in the van decided it would be better to park on a side street behind the QuikTrip. An attendant at a neighboring gas station heard the gunshots and saw 20-30 people scatter and leave the parking lot. Gholston shot in the direction of the parked car, breaking glass throughout the parking lot. Fourteen cartridge casings were found at the southwest corner of the QuikTrip. Brentashia was killed and another person was injured by the bullets. Clearly, Gholston knowingly or purposefully created a great risk of death to more than one person by firing a semiautomatic weapon into a crowded parking lot.

Gholston next argues that even if this court affirms the aggravating circumstance found by the trial court, it should reverse the hard 40 sentence because the mitigating circumstances outweigh the aggravating circumstances.

Where a trial court's refusal to find a mitigating circumstance under K.S.A. 21-4637 is challenged by the defendant, the standard of review is whether, after a review of all the evidence, viewed in a light most favorable to the defendant, a rational factfinder could have found by a preponderance of the evidence the existence of the mitigating circumstance. However, the trial court's decision

regarding a circumstance not enumerated as mitigating in the statute is within the trial court's sound discretion and will not be disturbed on appeal absent abuse of discretion. *State v. Spain*, 263 Kan. 708, 720, 953 P.2d 1004 (1998).

K.S.A. 21-4637(c) provides that a court may find that the fact that the victim was a participant in the defendant's conduct is a mitigating factor weighing against the imposition of the hard 40 sentence. Gholston asserts that the intended victim of the shooting, opposing gang member Parker, was a participant in gang violence; therefore, that fact should weigh as a mitigating factor. Gholston's argument assumes that since he was convicted on a transferred intent theory, the intent should transfer back to the intended victim when determining mitigating circumstances.

Gholston theorizes that if Parker had been killed in a gang-related shooting, he would have been a participant in the facts leading to the shooting and his participation in gang activities would constitute a mitigating circumstance. Gholston's argument reveals the inherent fallacy in his argument: Neither Parker nor Brentashia was injured while engaged in a gang activity. Parker's prior activities would not be a mitigating factor in a shooting because Parker was not engaged in gang activity when shot. Revenge is not a mitigating factor.

Gholston also argued to the trial court that his age, 17 years at the time of the crime, was a mitigating factor that outweighed the aggravating circumstance of risk of death to more than one person. Gholston cites *State v. de la Garza*, 138 Ariz. App. 408, 409, 675 P.2d 295 (1983), *disapproved on other grounds State v. Thurlow*, 148 Ariz. 16, 712 P.2d 929 (1986), where the Arizona court found that youth or old age only becomes a mitigating circumstance when, because of immaturity or senility, the defendant lacks substantial judgment in committing the crime.

Although age at the time of the offense is a statutory mitigating circumstance, K.S.A. 21-4637(g), age alone does not prevent the imposition of a hard 40 sentence. See *State v. Said*, 269 Kan. 657, 7 P.3d 1214 (2000) (defendant, age 16, sentenced to the hard 40 where the single aggravating circumstance was that defendant

knowingly and purposefully created a risk of death to more than one person.)

The trial court found that the aggravating circumstance of creating a risk of death to more than one person outweighed Gholston's young age. The judge noted that Gholston had killed a baby, and although she was tired of sending young men to prison for 40 years, she was also tired of senseless violence.

At age 17, Gholston was capable of judging the risks inherent in shooting a semiautomatic weapon into a crowded parking lot. The judge did not abuse her discretion.

### Hard 40 Sentence Violates the Constitution

Gholston also asserts that the hard 40 sentencing provisions violate the Sixth and Fourteenth Amendments to the United States Constitution. We disagree and point out that this court has previously determined that the hard 40 sentencing provisions do not violate the Sixth and Fourteenth Amendments to the United States Constitutions. See *State v. Conley*, 270 Kan. 18, Syl. ¶ 3, 11 P.3d 1147 (2000), where the court stated:

"Imposition of the K.S.A. 21-4638 hard 40 sentence based on a fact not found by the jury does not increase a defendant's maximum sentence of imprisonment for life imposed under K.S.A. 21-4706(c). The hard 40 sentence limits the lower end of the sentence. Defendant's hard 40 sentence violates neither the Due Process Clause of the United States Constitution nor [the] right to trial by jury under the Sixth Amendment to the United States Constitution or § 5 of the Kansas Constitution Bill of Rights."

Affirmed.