THE STATE OF KANSAS v. ALBERT WHITAKER.

1. INSTRUCTION, *Not Applicable to Facts.* An instruction ought not to be given, although it is a correct statement of the law in the abstract, which is not applicable to the facts that are in evidence.

2. —— *Erroneous Instruction.* Where the defendant is charged with the crime of murder in the first degree, an instruction which contains inferences and suggestions to the jury, not warranted by the facts in evidence, is erroneous; and unless it clearly appears that the defendant did not sustain any injury by such misdirection, the verdict in such a case must be set aside.

*Appeal from Osborne District Court.*

ON June 1, 1885, the following information — omitting court, title, and verification — was filed in the district court of Osborne county:

"I, the undersigned, county attorney of said county, in the name, by the authority and on behalf of the state of Kansas, give information that on the 19th day of May, 1885, in said county of Osborne and state of Kansas, one John R. Miller, John Cranshaw, and Albert Whitaker, did then and there unlawfully, feloniously, purposely and of their deliberate and premeditated malice, make an assault in and upon one Delbert J. Tunison, then and there being, and that the said John R. Miller a certain double-barreled shot-gun then and there loaded and charged with gunpowder and shot, which said shot-gun he, the said John R. Miller, then and there in both of his hands had and held to, against and upon him the said Delbert J. Tunison, then and there purposely, and of his deliberate and premeditated malice, did discharge and shoot off,

and that the said John R. Miller with the shot-gun aforesaid, then and there, by force of the gunpowder aforesaid, shot, discharged and sent forth as aforesaid out of the said shot-gun by him the said John R. Miller, then and there so as aforesaid discharged and shot off, him the said Delbert J. Tunison, in and upon the left side of the neck of him the said Delbert J. Tunison did strike, penetrate and wound, giving unto him the said Delbert J. Tunison, by the means and in the manner aforesaid, one mortal wound of the length of two and one-half inches, and of the depth of six inches, of which said mortal wound he the said Delbert J. Tunison shortly died, to wit, in about three hours after said wound was inflicted. The said defendants, John Cranshaw and Albert Whitaker, then and there by the means and in the manner aforesaid, aided, abetted and assisted the said John R. Miller to do as above set forth. The said John R. Miller, John Cranshaw and Albert Whitaker in manner and by the means aforesaid, purposely and of their deliberate and premeditated malice, him the said Delbert J. Tunison did kill and murder, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the state of Kansas.

A. SAXEY, *County Attorney.*"

Trial was begun October 12, 1885, before the court with a jury. On October 16th the jury returned a verdict against the defendant, *Albert Whitaker*, finding him guilty of murder in the first degree. On the same day the defendant filed his motion in arrest of judgment, and also his motion for a new trial. On October 17th both the motions were overruled. The defendant was sentenced in accordance with the verdict. He appeals.

*Hays & Pitts*, and *Walrond, Mitchell & Heren*, for appellant.

*S. B. Bradford*, attorney general, for The State.

The opinion of the court was delivered by

HORTON, C. J.: The information filed in this case charges John R. Miller with the murder of Delbert J. Tunison, and also charges John Cranshaw and Albert Whitaker with having aided, abetted and assisted in the commission of the crime.

John R. Miller was convicted of murder in the second degree, from which he appealed to this court. The opinion of this court was handed down, affirming that conviction. (*The State v. Miller*, ante, p. 328.)

Whitaker was convicted of murder in the first degree, at the October term of the district court of Osborne county for 1885, from which conviction he appeals.

It is claimed that the information upon which he was tried charges only an assault upon Delbert J. Tunison, and that if it charges anything more than an assault, it does not charge murder in the first degree. While the language of the information is subject to some criticism, we think it is sufficient within the authority of *Smith v. The State*, 1 Kas. 365, and *The State v. Brown*, 21 id. 38, as an information for murder in the first degree. It alleges, among other things, that on May 19th, 1885, in the county of Osborne and state of Kansas, John R. Miller, John Cranshaw and Albert Whitaker did then and there unlawfully, feloniously, purposely, and of their deliberate and premeditated malice, make an assault upon Delbert J. Tunison; that John R. Miller did, purposely and of his deliberate and premeditated malice, shoot off and discharge against the said Tunison a double-barreled shot-gun, loaded with gunpowder and shot, then and there held in his hands, giving him a mortal wound, of which he died in a few hours thereafter; that John Cranshaw and Albert Whitaker then and there, by the means and in the manner aforesaid, aided, abetted and assisted John R. Miller to do the acts set forth, and that said John R. Miller, John Cranshaw and Albert Whitaker, in the manner and by the means stated, purposely and of their deliberate and premeditated malice, did kill and murder said Tunison. The information, taken together, alleges that the killing of Tunison was willful, deliberate, and premeditated.

The evidence on the part of the state conduced to show that on Saturday, May 16, 1885, a difficulty occurred between Tunison and his wife; that her father, Jeremiah Miller, who lived a few miles away, learned of the trouble on Sunday

evening, and went at once to the residence of the defendant —Whitaker—who was a near neighbor of the Tunisons, and remained until Monday forenoon. In the forenoon of that day, while Tunison was absent from home, Jeremiah Miller, accompanied by Albert Whitaker, went to Tunison's house, hitched up a pair of horses found there to a wagon, and took Mrs. Tunison and her children to his home, carrying with him some goods and a cow, which property, together with the horses, Mrs. Tunison claimed as her own; that on Sunday preceding the killing of Tunison, as James Dwyer and wife were driving up to the house of Richard Dey, Whitaker came out from the stable up to the wagon, and handed Dey a chain, saying "Here's your chain; I will let you take it home;" that Dey then reached down in Whitaker's shirt-pocket and pulled out a pistol; that Dey asked Whitaker what use he had for it; that he answered, "He might have use for it before to-morrow morning;" that Dey asked him who he was about to get into trouble with, and that Whitaker said, "The man in the stone house," pointing to where Tunison lived; that he said he had been looking in his trunk for cartridges, but had not found any; that he was going up to where Dey was to see if he could get some; that on the same Sunday night Whitaker said to George Piatt "He wanted to see Dick Dey to get some cartridges of him; that he had laid out a couple of men in his time, and expected to have another laid out before sundown—a person about six feet and a half tall;" that upon being asked "Who he was in trouble with," he said "His cousin—Del. Tunison;" that Whitaker brought word to the Millers on Monday, the 18th, that Tunison was to come up that night and take the horses away; that John R. Miller and Charles Miller are sons of Jeremiah Miller and brothers to Mrs. Tunison; that John Cranshaw is a son-in-law of Jeremiah Miller, and Albert Whitaker, the defendant, a cousin of Tunison, and that all of these persons were at Miller's the night of the murder; that about eleven o'clock P. M. of said May 18th, John R. Miller and Charles Miller went down to the stable in anticipation of Tunison coming to re-

take the horses; that about twelve or one o'clock that night John R. Miller, without any excuse or justification, shot and killed Tunison at the stable; that on Tuesday morning, May 19th, Whitaker told John Loe "Del. Tunison was dead; that he came up to the Millers for the property the night before, and John Miller shot him;" that upon being asked whether Tunison tried to get away, he said "No, we surrounded the stable;" that Mrs. Loe asked who was there, and he answered, "John Cranshaw, Charley and John Miller, and himself; that John and Charley Miller were in the stable when Tunison came for the horses, and Cranshaw and himself were on the outside of the stable."

Upon the evidence introduced by the state, there was sufficient before the jury to justify the verdict rendered, because if the killing of Tunison by Miller was wholly without justification, and Cranshaw and Whitaker were outside of the barn while John and Charles Miller were in the inside, the evidence is amply sufficient to show that Cranshaw and Whitaker were aiding and abetting the commission of the crime; therefore, if no question was before us other than the one urged so strenuously, that the evidence does not support the verdict, we would necessarily decide the appeal adversely.

A serious question, however, is presented upon the following instruction of the trial court:

"If you believe from the evidence that John R. Miller was justified in killing Tunison, then you will find the defendant not guilty, unless you shall find that defendant falsely reported, directly to John R. Miller, or through others to John R. Miller, certain threats, which he claimed deceased had made to him with reference to the persons and property of the Millers, and thereby produced in the mind of John R. Miller such a reasonable and honest conviction that he (John R. Miller) was in danger of his life from Tunison at the time of the shooting, as would justify John R. Miller in killing Tunison, when, as a matter of fact, the deceased, Delbert J. Tunison, did not utter to the defendant the threats which he so reported, directly or indirectly, to John R. Miller.  Under these circumstances, if you shall find that defendant falsely reported such threats, directly or indirectly, or through others, to John R.

Miller, with intent to cause John R. Miller to kill deceased, and you shall find that John R. Miller did kill the deceased by reason of the honest and reasonable fear, induced by said threats so communicated, and that it was not actually necessary for John R. Miller to kill deceased to preserve his own life, then you may find the defendant guilty, although you may believe John R. Miller was justified in killing the deceased, or you may find the defendant guilty of a higher degree of crime, if any, than you believe John R. Miller guilty of."

On the part of the defense, evidence was offered showing that on May 18th Delbert J. Tunison said to Richard Dey, "He would go up to the Millers', steal the horses, murder the outfit, set the things on fire, and skip the country." William Price also testified that he saw Tunison with Whitaker on May 18th, and that Tunison said to Whitaker at the time, "He was going over to get his brother Bill and a couple of six-shooters, and go and get his property at the Millers'." Mrs. Tunison testified that on Monday, the 18th, between five and six o'clock, after she had reached her father's house, Whitaker came to the house and told them "Del. said he would go over and get his brother Will and two six-shooters, and come up and take his property, set the ranch on fire, and if any of us interfered, he would kill us;" that "there were present at this conversation, besides herself, her father and mother, Mrs. Cranshaw, and her three younger sisters; that John R. Miller and John Cranshaw came to the house that night at about nine o'clock, and she communicated to them the threats Whitaker said Del. had made." Mrs. Jeremiah Miller also testified that these threats reported by Whitaker as coming from Del. Tunison, were communicated by her to John R. Miller, on the evening of May 18th.

What occurred at the stable when Tunison was killed, on the night of May 18th, according to the defense, is as follows:

"Charles Miller took a gun from his father's house down to the stable that night a little after eight o'clock, and set it down just on the inside, and then went back to the house and watched to see if anyone came to the stable; that about a quarter of eleven he heard a noise at the stable, and John went with him down there; that both of them went into the

stable and sat down; after being there about an hour, Del. Tunison came into the stable at an opening, went up to a horse which belonged to Cranshaw; he untied it and took it out; he tied this horse to a post near by and returned to the stable; at this time John had the gun which Charles had taken to the stable. When Tunison came in, John said to him, 'Halt;' Tunison said, 'Go to hell, you damned son-of-a-bitch; I've got the drop on you, and I shall kill you for luck,' drawing a revolver from his coat. As these words were uttered, John Miller shot Tunison in the neck; he fell backward, and died in a few hours afterward."

In regard to the instruction complained of, the argument of the state is as follows:

"A homicide is committed. A deliberately and premeditatedly procures B to do it. Knowing that the deceased will be át a certain place at a certain time, he reports to B false threats of an intent on the part of the deceased to do great bodily harm to B. At the time and place B meets the deceased, and his mind being poisoned by the communications of A, he believes that he is in danger of his life or of great bodily harm, and to prevent it the homicide is committed by him. So far as B is concerned, the homicide is justifiable. But A, deliberately and premeditatedly intending to accomplish the killing of the deceased, adopted such means as would effect that end, and the killing results by reason of the means A deliberately adopted for that purpose. A would be guilty of murder in the first degree, although B's act, so far as he alone was concerned, was justifiable. B was but the blind, irresponsible instrument of another mind."

The proposition thus stated is a sound one, but we do not think the evidence in the case warrants the instruction. It is probably true that John and Charles Miller were at the stable on the night of the killing of Tunison, on account of the threat reported by Whitaker that Tunison said he was coming after the horses which had been taken away from his house. But there is sufficient evidence in the record to show that Tunison intended to come that night to retake the horses, and it is undoubtedly true he gave out that he was coming so to do. This is corroborated by the fact that he did come that very night for that purpose.

47 — 35 KAS.

The court in its instruction suggested that this threat, as well as the others, was falsely reported by Whitaker; the suggestion of its falsity, in the absence of any proof, ought not to have been made by the court, and it was not consistent with the evidence for the court to intimate that this threat was not uttered by Tunison. There is no affirmative evidence in the record that the other threats reported by Whitaker to have been made by Tunison, were not so made, but the other threats are so extravagant and so unlikely to have been made by any person about to commit such acts, that we suppose the jury might have inferred the threats "to burn the house and kill the Millers" were never uttered by Tunison.

We cannot perceive that the extravagant threats about the killing and burning, reported by Whitaker to have been made by Tunison, induced in John R. Miller such an honest and reasonable fear as caused him to believe it was actually necessary to kill Tunison to preserve his own life. Upon the facts disclosed in the record, we do not think that the court ought to have intimated to the jury that the threats so communicated were likely to have that effect upon Miller. If the killing of Tunison was justifiable, it was upon the testimony of the defense that when he entered the opening of the stable at the time he was shot, he drew a revolver as if to shoot Miller, at the same time stating: "I've got the drop on you, and I shall kill you for luck." The defense attempted to show that Tunison was not only trying to get possession of the horses which his wife had taken away, but was also attempting to steal the horse owned by Cranshaw, and when Miller called on him to halt as he was entering the stable, he attempted to take his life. Upon the evidence offered by the state, the threats communicated to John R. Miller were no justification to Miller for the killing of Tunison. Upon the theory of the defense, the threats communicated were not the direct cause of the killing of Tunison.

Again, the threats reported by Whitaker were communicated to John and Charles Miller several hours before the

killing of Tunison.    There was ample time after the report of
these threats for the parties to have had Tunison arrested, if
these threats in any way created fear in their minds that their
lives were in danger, or great bodily harm likely to occur;
no such steps were taken. (*The State v. Rose*, 30 Kas. 501.)
Upon no view of the evidence embraced in the record can we
assume that John R. Miller was an "innocent agent" in the
killing of Tunison; nor does the evidence show in any way
that he was the blind and irresponsible instrument of Whita-
ker.    No fair inferences from the facts in evidence upon the
trial, warrant the theory that John R. Miller was the "innocent
agent."    Miller was either guilty of murder in killing Tunison,
or else the homicide was justifiable on account of the words
and acts of Tunison at the time that Miller shot him.    Only
upon the theory that John R. Miller was the "innocent
agent" of Whitaker, could the court have given the instruc-
tion complained of.    It is impossible for us to say that this
instruction was not the controlling one with the jury.    In our
opinion, it is wholly erroneous.

Because of the instruction given, herein referred to, the
judgment is reversed, and the prisoner will be remanded for a
new trial.

All the Justices concurring.