No. 104,827

STATE OF KANSAS, *Appellee*, v. SAMUEL D. LLAMAS, *Appellant*.

(311 P.3d 399)

Opinion filed October 25, 2013.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, argued the cause, and *Ryan Eddinger*, of the same office, was on the brief for appellant.

*Sarah E. Washburn*, assistant county attorney, argued the cause, and *Amy L. Aranda*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: A jury convicted Samuel D. Llamas of one count of felony murder, in violation of K.S.A. 21-3401(b), and one count of criminal discharge of a firearm at an occupied vehicle, in violation of K.S.A. 21-4219(b). The State's theory was that Llamas aided and abetted Michael Ismael Navarro, who actually discharged the firearm and killed Omar Flores. On appeal, Llamas argues he was merely present at the time of the shooting and did nothing to aid and abet Navarro's discharge of a firearm into the vehicle occupied by Flores. He raises three legal issues related to this factual contention: (1) The evidence against him was insufficient; (2) the trial court erred by failing to explain to the jury that mere association with a principal who commits a crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor; and (3) the trial court should have instructed the jury to view with caution the testimony of Navarro's girlfriend, who Llamas asserts was Navarro's accomplice and whose testimony he believes was prejudicial to his defense.

We hold: (1) The evidence was sufficient to support the jury's verdict because there was evidence that Llamas took an active role in the commission of the crimes and intended to aid and abet Navarro; (2) the trial court did not err in failing to add Llamas' proposed "mere association or presence" language to the aiding and abetting jury instruction, although the better practice would have been to add the language; and (3) any error in failing to instruct the jury to consider the testimony of Navarro's girlfriend with caution because she was an accomplice was harmless. Consequently, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

During the summer of 2009, Navarro and Flores agreed to deal methamphetamine. Flores provided Navarro a train ticket to California, where Navarro was to purchase drugs. Navarro partially paid for the drugs with money supplied by his girlfriend Ruby Camarena. Navarro's California source fronted the remaining amount. Navarro returned to Kansas and delivered the methamphetamine to Flores on July 4, 2009. Flores agreed to pay Navarro when he sold the drugs and also promised that another individual, Matthew Miller, would pay for the drugs if Flores was unable to do so.

In the days following the July 4 transaction, Flores did not pay Navarro. The California source began calling about the "fronted" money Navarro still owed for the drugs, and Navarro became increasingly angry at Flores. Navarro repeatedly called Flores' cell phone, but Flores did not answer. It was "like he disappeared." Navarro believed Flores was avoiding him, so he told his friends, including Llamas, to notify him if they saw Flores because he had "unfinished business" with Flores. During this time, Navarro would "hang out" almost daily with a group of friends that frequently included Llamas and Navarro's girlfriend's brother, Michael Camarena. (Michael and Ruby Camarena will be referred to by their first names to avoid confusion.) Navarro repeatedly told these friends that "something was going to happen to Mr. Flores if he did not give him the money."

At one point, Ruby, who lived with Navarro in Emporia and frequently served as Navarro's translator, went with Navarro to see Miller in an attempt to collect the money from him. Miller refused to pay.

Sometime later, Navarro received word from Michael that Flores was near a restaurant in Emporia where Michael and his friend Joseph Meyers were eating. Navarro, Llamas, and Llamas' cousin drove to the restaurant. Navarro got out of the car and confronted Flores, who was sitting in his white Suburban. Llamas and his cousin remained in the car, and Michael and others gathered nearby. When Navarro rejoined his friends, he reported that he had given Flores "additional time to come up with the money" but had told Flores that he "better pay" or "he would mess him up."

When Flores still did not pay, Navarro asked Llamas to impersonate the California drug source and call Miller. The purpose of the call was to intimidate Miller into finding Flores and "letting him know how he felt and what the situation was." According to Miller, the person on the phone identified himself as "Joe." He asked for Flores' location and said Flores owed him money. The caller's tone was "convincing" and "firm," and he told Miller that "he was going to get his money one way or another." Miller subsequently told Flores about the phone call.

Navarro also continued to look for Flores. Llamas and Navarro's other friends—basically whoever was "hanging out at the time"—frequently accompanied Navarro as he would drive around Emporia looking for Flores. As time passed, Navarro became increasingly agitated and told his friends, including Llamas, he was going to kill Flores. Despite these statements, Michael and Meyers testified they did not believe Navarro would kill Flores but thought "at the worst [Flores] was going to get beat up."

On September 8, 2009, Meyers called Ruby on her cell phone. Because Navarro did not have his own cell phone, Meyers asked Ruby to tell Navarro that Flores had been seen in Emporia. Meyers also gave her specifics about Flores' location. Ruby relayed the information to Navarro, who went into the garage where, according to Ruby, he kept a couple of rifles, referred to as "long guns" or "long rifles." Michael, who disposed of one of the rifles in a local

river after Flores' death, described the rifle to the jury as a semi-automatic .22 caliber "long rifle" with a wood stock and steel barrel that was "as long as my arm spread." Navarro left his house, driving a silver Honda Civic.

Navarro picked up Llamas and drove toward the location where Flores had been seen. Navarro spotted Flores' white Suburban, which he followed to a motel. Descriptions of what transpired at that point were given to the jury through the testimony of Michael, who was told about the incident by Llamas; the motel owner, who observed some of the incident; and law enforcement officers, who told the jury about statements made to them by Llamas and the motel owner.

Michael testified that Llamas told him Navarro got out of the car with the rifle. In response to a question by the prosecutor, Michael agreed that Llamas "was well aware that there was a rifle" in the Honda. Navarro confronted Flores, who stepped toward Navarro while grabbing for the rifle. Navarro shot Flores from the side and "then started unleashing on him." Llamas told Michael, "[I]t was like a movie or it was like—it was unreal. . . . [Llamas] didn't really believe it was happening." Llamas told Michael that after the shooting "Llamas did not get back in the vehicle with Mr. Navarro, that Mr. Navarro drove the vehicle away and Mr. Llamas had walked and met up at the gas station to get something to drink."

According to the testimony of a law enforcement officer, Llamas initially gave a much different version of events when he agreed to talk to law enforcement officers approximately 1 week after the shooting; he denied any knowledge other than what he had read in the newspaper. When confronted with a "still shot" taken from a convenience store video that showed him entering the store with Navarro a few minutes after the shooting, Llamas admitted to being present. He told officers that Navarro picked him up so they could go to a store to buy beer. While driving, Navarro spotted Flores and started following him. Llamas said he told Navarro they should get the beer and go home, but Navarro wanted to talk to Flores. Llamas told officers that he stayed in the car while Navarro got out and talked to Flores. When Llamas heard the gunshots, he pan-

icked, got out of the car, and ran. Navarro pulled up to him in the Honda and told him to get in the car, but Llamas refused. According to Llamas, Navarro told him that if he said anything about what had happened to Flores, the same thing would happen to him. Llamas said he walked to the nearby convenience store, and Navarro caught up with him.

The motel owner, who witnessed the scene after the shots were fired, told law enforcement officers that he saw a Honda, a Suburban, and two men standing outside the vehicles. One man was standing near the driver's door of the Suburban and the other near the driver's door of the Honda. Both men got into the Honda after the shooting. The person who was near the Suburban got into the Honda's front passenger's seat, the other person got into the driver's seat. In his trial testimony, the motel owner was not as specific regarding the movement of the two men but did testify he saw two men get into the Honda.

The jury also learned that emergency personnel found Flores in the driver's seat of his Suburban, slumped over the center console. The doors were closed, but the driver's side window was rolled down. Based on the blood spatter and Flores' position, investigators concluded the shooting either began or continued through the open window. While there was blood outside the vehicle as well, investigators could not determine if it was left when Flores was pulled out of his vehicle for emergency medical treatment or was the result of wounds sustained while Flores stood outside the vehicle. Flores was shot four times in the head, six times in the torso, and once in the arm with a .22 caliber weapon.

The jury also heard a law enforcement officer testify about the contents of a surveillance tape that showed the view from several cameras located in the convenience store near the motel; the tape included a time stamp. Approximately 2 minutes after the 911 call reporting shots being fired at the motel, Navarro and Llamas "walk[ed] casually up to the door" of the store while Llamas used his cell phone. The cameras captured Navarro and Llamas walking into the store together and moving to the back of the store near the coolers. Approximately 1 minute later, Navarro walked to the front of the store, looked out the door, and then returned to the

coolers. Then, both Navarro and Llamas returned to the front of the store with two drinks, which Llamas purchased with cash. Navarro left the store, but Llamas remained and played a video game for 2 to 3 minutes.

Cell phone records were also admitted into evidence. These established that Llamas called his uncle at the time he and Navarro were approaching the convenience store; Llamas' uncle testified that Llamas asked him for a ride. The cell phone records also established that Llamas called Ruby's cell phone less than 50 minutes after the 911 call was logged. Several days later, Llamas called Navarro in Mexico, where Navarro had gone just days after the shooting.

The State pursued an aiding and abetting theory and charged Llamas with one count of felony murder, in violation of K.S.A. 21-3401(b), and one count of criminal discharge of a firearm at an occupied vehicle, in violation of K.S.A. 21-4219(b). The State granted derivative use immunity, see K.S.A. 22-3415(b)(2) and (c), to several witnesses who testified at trial, including Ruby, Michael, and Meyers. A jury convicted Llamas as charged. He received a controlling sentence of life imprisonment without the possibility of parole for 20 years.

Llamas filed a timely appeal, and this court has jurisdiction over that appeal under K.S.A. 22-3601(b)(1) (maximum sentence of life imprisonment imposed).

## There Was Sufficient Evidence

First, Llamas argues the trial court erred in denying his motion for a judgment of acquittal because there was insufficient evidence to establish that he "maliciously and intentionally, and without authorization, aided and abetted another in the discharge [of] a firearm at an occupied motor vehicle" under Jury Instruction No. 16. See K.S.A. 21-4219(b) (defining elements of criminal discharge of a firearm at an occupied motor vehicle and classifying the crime as a felony); PIK Crim. 3d 64.02-A-1 (pattern element instruction for criminal discharge of a firearm—felony). Llamas also argues that because this evidence was insufficient there was not sufficient evidence for the jury to find beyond a reasonable doubt that Llamas

or another killed Flores and "[t]hat such killing was done while in the commission of the crime of criminal discharge of a firearm at an occupied vehicle" under Jury Instruction No. 15. See K.S.A. 21-3401(b) (defining first-degree murder to include felony murder); K.S.A. 2009 Supp. 21-3436(a)(15) (defining inherently dangerous felony, whether or not such felony is distinct from the homicide, to include felony violation of K.S.A. 21-4219, criminal discharge of a firearm at an occupied vehicle); PIK Crim. 3d 56.02 (pattern element instruction for first-degree felony murder).

Llamas first raised this issue in a motion for acquittal after the State rested its case. There, as here, Llamas relied on well-established caselaw holding that " '[m]ere association with the principals who actually commit the crime or mere presence in the vicinity of the crime [is] insufficient to establish guilt as an aider and abettor.' " *State v. Edwards*, 291 Kan. 532, 551-52, 243 P.3d 683 (2010) (quoting *State v. Green*, 237 Kan. 146, Syl. ¶ 4, 697 P.2d 1305 [1985]); see *State v. Burnett*, 293 Kan. 840, 851, 270 P.3d 1115 (2012). Rather, "to be guilty of aiding and abetting a defendant must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed." *State v. Schriner*, 215 Kan. 86, 92, 523 P.2d 703 (1974). Llamas argued then, as he does now, that it is only the circumstance of his presence that provides any evidence that he aided and abetted the crime.

When Llamas presented his motion for acquittal to the trial court, the court was obligated to "order the entry of judgment" if there was not sufficient evidence of each element of a charged crime. K.S.A. 22-3419(1); see *State v. Murdock*, 286 Kan. 661, 668, 187 P.3d 1267 (2008) (trial court's "decision to grant a motion for judgment of acquittal is not discretionary"). Here, the trial court denied the motion, noting there was evidence that Llamas was aware of the ongoing dispute between Navarro and Flores; had heard Navarro threaten to kill Flores; was in "a very small car, a Honda Civic, and that a .22 rifle was used"; and was present when the shooting occurred. The trial court further noted, "One could deduce that [in] a small car with a rifle, Mr. Llamas could have

known or should have known what was going to happen given the circumstances should they ever catch up with Mr. Flores."

In considering the trial court's decision to deny Llamas' motion for acquittal, we consider all the evidence in the light most favorable to the prosecution and determine if a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Raskie*, 293 Kan. 906, 919-20, 269 P.3d 1268 (2012). In doing so, we do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *Raskie*, 293 Kan. at 920; *State v. Ward*, 292 Kan. 541, 581, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

In considering Llamas' arguments that he was only a bystander to the crime, we must separate his actions from those of Navarro. Llamas does not dispute that there was sufficient evidence to establish that Navarro—as the principal—committed the underlying felony of criminal discharge of a firearm at an occupied vehicle and, in the course of committing that felony, killed Flores. Indeed, Navarro told his friends he shot Flores, the blood spatter patterns established that shots were fired while Flores was in the vehicle, and Flores died from gunshot wounds. See *State v. Farmer*, 285 Kan. 541, 545-48, 175 P.3d 221 (2008) (rejecting theory that evidence of shooter's intent to shoot *victim* meant there was insufficient evidence of crime of criminal discharge of a weapon *at an occupied vehicle*). Our sole focus is on whether the State presented sufficient evidence that Llamas maliciously and intentionally aided and abetted Navarro in the commission of the crimes. To meet the State's burden, it did not have to prove that Llamas intended to aid or abet the shooting or killing of Flores, only that he intended to aid and abet the discharge of a weapon at an occupied vehicle, a felony the legislature has deemed inherently dangerous. The requisite intent to aid and abet the inherently dangerous felony may be inferred from circumstantial evidence. *State v. Goering*, 225 Kan. 755, 758, 594 P.2d 194 (1979).

In arguing whether the evidence was sufficient to establish that Llamas willfully and knowingly participated in the crimes, both parties direct this court to *State v. Herron*, 286 Kan. 959, 189 P.3d 1173 (2008), which discusses the difference between mere pres-

ence and aiding and abetting. In *Herron*, the defendant was convicted of felony murder based on his aiding and abetting the underlying felony of criminal discharge of a firearm at an occupied dwelling. The defendant argued on appeal that he was unarmed and was merely present in a van from which other individuals fired weapons. On appeal, this court rejected that argument, finding there was sufficient evidence that Herron had aided and abetted the crime. *Herron*, 286 Kan. at 965-68. The evidence indicated there had been an ongoing feud between the victim's son and two other men in the victim's neighborhood, and Herron had been involved in the ongoing dispute. Summarizing the evidence, this court stated:

"A rational factfinder could easily have concluded that Herron was a willing participant in a planned, retaliatory shooting. His friends had traded gunfire with [the victim's son] throughout the day; his good friend had been shot while in a car; and his own house had been fired on earlier. Furthermore, Herron's associate had stolen the van so that they would not be recognized; the group loaded it with pistols, high-powered semi-automatic rifles, and ammunition; they drove to the [victim's] house; and they pummeled it with more than 30 rounds before speeding away, ditching the van, and scattering. Herron's felony-murder conviction was supported by sufficient evidence." *Herron*, 286 Kan. at 968.

The *Herron* court distinguished its case from *State v. Simmons*, 282 Kan. 728, 148 P.3d 525 (2006). In *Simmons*, three witnesses were aware of the defendant's plan to rob a victim, and they ultimately received some fruits of his illegal labors in the form of $100 bills as incentives for silence. The defendant sought reversal of his convictions based on the trial court's failure to caution the jury concerning "accomplice testimony" in accordance with PIK Crim. 3d 52.18. The *Simmons* court concluded there was no error because, in part, the witnesses did not participate in the crime and, therefore, were not accomplices. This court held that their mere presence during the planning stages, their failure to stop or report the crime, and their receipt of stolen goods absent a prearranged plan of theft and delivery did not make them accomplices. *Simmons*, 282 Kan. at 737-39.

In distinguishing *Simmons*, the *Herron* court emphasized that "when a person knowingly associates with an unlawful venture and

participates in a way that demonstrates willful furtherance of its success, guilt as an aider and abettor is established. [Citations omitted.]" *Herron*, 286 Kan. at 968. Unlike the situation in *Simmons*, Herron did more than listen to his associates' discussion. He participated in the planning, the mobilization, and the actual attack. *Herron*, 286 Kan. at 968.

Llamas suggests his presence is like that of the witnesses in *Simmons*. He further argues the present case is distinguishable from *Herron* in that "[t]here was no evidence to show a history of violence between Mr. Flores and Mr. Navarro" and no evidence that Llamas committed any act to assist in Navarro's "venture." The State disagrees and contends that, as in *Herron*, ample evidence supports the conclusion that Llamas participated in the events that led up to the shooting and was more than a mere bystander at the motel when the shooting took place.

Indeed, as the State argues, the evidence, when viewed in the light most favorable to the prosecution, was sufficient to support Llamas' conviction for felony murder and for criminal discharge of a firearm at an occupied vehicle. Although there was no history of violent attacks between Navarro and Flores, it was well known among Navarro's circle of friends, including Llamas, that Navarro felt a great deal of animosity toward Flores, this animosity was escalating, and Navarro had threatened to kill Flores. Further, contrary to Llamas' assertion that he never assisted Navarro in his "venture," there was evidence that Llamas had actively assisted Navarro over a several-month period by calling Miller and impersonating the California source and by helping look for Flores. Then, as the trial court noted, when Llamas got in the car with Navarro on the day of the shooting there was a "long-rifle" in the car. Michael provided evidence of the length of the rifle and indicated, based on Llamas' account of what happened, that Llamas was aware Navarro had the rifle in the car. A reasonable juror could conclude from this evidence that Llamas had helped Navarro track Flores with knowledge that Navarro planned to use the rifle if he found Flores.

More significantly, the motel owner told law enforcement officers he saw two men standing at the scene in the parking lot after

the shots were fired—one was standing near the driver's side of the Suburban and the other near the driver's side of the Honda. The owner reported that the man who subsequently entered the passenger's side of the Honda was the one who had been standing near the driver's side of the Suburban. The second man, who had been standing near the driver's side of the Honda, got into the driver's seat and drove the Honda out of the parking lot.

As the State points out, the jury could have inferred from this evidence that if Llamas was the passenger, he had been standing near the driver's door of Flores' Suburban during the shooting and, thus, assisted in intimidating Flores or blocking Flores' ability to escape. Alternatively, if Llamas was the person standing near the driver's side of the Honda, he purposefully moved from the passenger's side of the vehicle where he had been riding to the driver's side so that he could drive them away from the scene of the crime. Either alternative would be an act that aided and abetted the discharge of a firearm at an occupied vehicle. See *State v. Gant*, 288 Kan. 76, 84, 201 P.3d 673 (2009) (driving a vehicle with intent to transport others to or from crime scene sufficient to support conviction for aiding and abetting crime); *State v. Whitaker*, 35 Kan. 731, 735, 12 P. 106 (1886) (defendants who surrounded stable to prevent victim's escape guilty of aiding and abetting assault that resulted in death); *cf. State v. Gholston*, 272 Kan. 601, 618, 35 P.3d 868 (2001) (witness went with defendant to convenience store where shooting occurred, but witness never saw the gun in the car and never saw defendant get out of the car with the gun; thus, there was no evidence that witness had knowingly aided, associated, or participated in the crime), *cert. denied* 536 U.S. 963 (2002).

In addition to this direct evidence that Llamas participated in the action at the scene, there is circumstantial evidence of Llamas' intent to aid and abet Navarro's crimes. This evidence includes Llamas' participation in the conflict leading up to the shooting, his actions of getting out of and back into the Honda, his actions of accompanying Navarro from the scene, his demeanor at the convenience store while interacting with Navarro and while waiting for his ride after Navarro left the store, and his contact with Na-

varro after Navarro was in Mexico. See *State v. Morton*, 277 Kan. 575, 582, 86 P.3d 535 (2004) (circumstantial evidence that gives rise to inference of intent includes evidence of "[1] the nature of the weapon used; [2] lack of provocation; [3] the defendant's conduct before and after the killing; [4] threats and declarations of the defendant before and during the occurrence"). From this circumstantial evidence, a reasonable jury could conclude beyond a reasonable doubt that Llamas formed the intent to aid and abet Navarro as he shot at the vehicle in which Flores sat. Further, the jury could conclude this intent was formed *before* Llamas moved from the passenger seat of the Honda to either the driver's door of the Honda or the driver's side of the Suburban.

In summary, when viewed in a light most favorable to the prosecution, there was evidence from which a rational factfinder could find Llamas guilty beyond a reasonable doubt of aiding and abetting Navarro in the commission of the underlying inherently dangerous felony of criminal discharge of a firearm at an occupied vehicle and in the commission of felony murder.

### MODIFIED VERSION OF PIK CRIM. 3d 54.05

The trial court gave the following instruction on aiding and abetting, which conforms with PIK Crim. 3d 54.05 (responsibility for crimes of another):

"A person who, either before or during its commission, intentionally aids another to commit a crime with the intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the Defendant's participation, if any, in the actual commission of the crime."

At the jury instruction conference, defense counsel asked that the following language be added to the aiding and abetting instruction:

"[M]ere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abetter. To be guilty of aiding and abetting in the commission of the crime the defendant must willfully associate himself with the unlawful venture and willfully participate in it as he would something he wishes to bring about."

This paragraph, adding the "mere association or presence" language, was compiled from caselaw discussing criminal liability

based on aiding and abetting. See *State v. Tyler*, 286 Kan. 1087, 1093, 191 P.3d 306 (2008); *Schriner*, 215 Kan. at 92-93.

On appeal, Llamas argues that the trial court erred in refusing to give the additional language because the jury was left without direction regarding Llamas' defense, which was that he was merely present but did not assist Navarro in the act of shooting Flores. The result, according to Llamas, was that he was hindered from presenting his defense and the jury was confused, as demonstrated in part when it asked for a clarification of each criminal charge in "layman's" terms and for a "definition" of aiding and abetting. He suggests the trial court could have cured the error by providing the language Llamas had previously suggested, but the court failed to do so and simply indicated that "[t]he terms and charges are defined within the instructions as previously given." Finally, Llamas asserts the jury could have understood that Llamas was guilty if he aided someone during any *separate* crime—such as aiding in the drug deal by impersonating a drug dealer in the phone call to Miller—regardless of whether he had an intent to promote or assist the discharge of a firearm at an occupied vehicle—the charged crime.

In reviewing a claimed instructional error, we conduct a four-step analysis. Those steps, with accompanying standards of review, are:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

Here, under the first step of analysis, Llamas preserved this issue by making his request for the additional language during the instruction conference. At the next step of analysis, we must consider whether the modified instruction was legally appropriate. In this

regard, Llamas is correct that caselaw supports the content of his proposed instruction. Nevertheless, the official Comment to PIK Crim. 3d 54.05 indicates that the trial court may properly refuse to add "mere presence or association" language because the pattern instruction "clearly informs the jury that intentional acts by a defendant are necessary to sustain a conviction for aiding and abetting." This comment is consistent with the holdings of this court in several cases. See *Edwards*, 291 Kan. at 552; *State v. Pink*, 270 Kan. 728, 738-39, 20 P.3d 31 (2001), *overruled on other grounds State v. Gleason*, 277 Kan. 624, 88 P.3d 218 (2004); *State v. Jackson*, 270 Kan. 755, 760-61, 19 P.3d 121 (2001); *State v. Ninci*, 262 Kan. 21, 46, 936 P.2d 1364 (1997); *State v. Scott*, 250 Kan. 350, 361, 827 P.2d 733 (1992); *State v. Hunter*, 241 Kan. 629, 639, 740 P.2d 559 (1987).

*Edwards*, the most recent of these opinions, was filed approximately 6 months after Llamas' trial. There, we held the trial court did not err in refusing to give an instruction that was nearly identical to the one requested by Llamas. See *Edwards*, 291 Kan. at 552. In asserting error, Edwards argued the additional language was necessary because of his theory of defense, which was that he merely accompanied the others to the victim's house to buy marijuana, without any knowledge of the robbery plan.

The *Edwards* court acknowledged that the mere association or presence language reflected Kansas law and precisely fit Edwards' defense theory. And the court went so far as to say that "perhaps the better practice would have been to modify the patterned instruction accordingly." *Edwards*, 291 Kan. at 552. But the *Edwards* court rejected an argument that error had been committed, stating:

"Nevertheless, this court has repeatedly held that juries are presumed to intuit from the word 'intentionally' in the patterned instruction that proof of mere association or presence would be insufficient to convict. See, *e.g.*, *State v. Hunter*, 241 Kan. 629, 639, 740 P.2d 559 (1987); [*State v.*] *Davis*, 283 Kan. [569,] 582-83[, 158 P.3d 317 (2006)]. Based on that precedent, we decline to find that the district court's refusal to add the requested language to the patterned instruction on aiding and abetting was reversible error." *Edwards*, 291 Kan. at 552.

See *Pink*, 270 Kan. at 739 (stating it was "well established" that a trial court does not err when it does not add mere association or presence language to aiding and abetting instruction).

As in *Edwards*, the mere association or presence language requested by Llamas reflected Kansas law and fit his theory of defense. But, as our past cases hold, the instruction as given was consistent with and did not foreclose his defense.

Further, while the aiding and abetting instruction did not limit the jury's consideration to only aiding and abetting the criminal discharge of a firearm at an occupied vehicle, the elements instruction indicated that the State had to establish that Llamas "aided and abetted another in the discharge [of] a firearm at an occupied motor vehicle." When we review claimed instructional error, "we examine the instructions as a whole, rather than isolate any one instruction." *State v. Ellmaker*, 289 Kan. 1132, 1139-40, 221 P.3d 1105 (2009), *cert. denied* 130 S. Ct. 3410 (2010). In addition, we presume the jury followed the instructions. *State v. Mitchell*, 294 Kan. 469, 482, 275 P.3d 905 (2012). Applying these rules, we reject Llamas' argument that the jury was not clearly informed that Llamas had to aid and abet the commission of the inherently dangerous felony of criminal discharge of a firearm at an occupied vehicle.

Finally, there is no indication the failure to add the mere association or presence language led to a misunderstanding by the jury. Even though the jury asked for explanations of the elements of the crimes and for a definition of aiding and abetting, the jury's request does not suggest that the jurors were confused about the focus of this issue—that Llamas had to intentionally act in a manner that aided and abetted Navarro's criminal discharge of a firearm at an occupied vehicle.

In summary, we conclude the trial court did not err in refusing to add the requested language to the PIK instruction. Because we reach that conclusion, we need not address the remaining steps in the analysis of claimed instructional error.

Nevertheless, we reiterate and stress what we said in *Edwards*, 291 Kan. at 552: The better practice would be to include the mere association or presence language when a defense is based on the theory that a defendant was merely present and did not actively aid and abet a crime. We encourage trial judges to use language from our cases, such as was suggested in this case. Failing to do so may not constitute error if, as in this case, the instructions properly

and fairly state the law as applied to the facts of the case. See *Plummer*, 295 Kan. at 161; *Ellmaker*, 289 Kan. at 1140. That does not mean the instruction cannot be improved upon, and adding the mere association or presence language would do so by explaining the legal concepts in commonly understood words.

INSTRUCTIONAL ERROR IN FAILING TO LIST ALL ACCOMPLICES

Finally, Llamas argues the trial court erred in failing to include a reference to Ruby in Instruction No. 10, which conformed to PIK Crim. 3d 52.18 and provided as follows:

"An accomplice witness is one who testifies that he or she was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice. You may only apply this instruction to the testimony of Joe Meyers."

During the jury instruction conference, Llamas requested Ruby be listed in the accomplice jury instruction along with Meyers. Defense counsel emphasized that Ruby regularly translated for Navarro and argued that it was hard to believe that she did not understand the meaning of Meyers' phone call informing Navarro of Flores' location on the night of the shooting. In essence, the defense counsel argued Ruby played as much or more of a role in the crimes as Meyers. The trial court refused to include Ruby in the instruction, limited the instruction to Meyers, and did so without explaining the basis for the differentiated treatment between Meyers and Ruby.

Turning to the four-step analysis related to claimed instructional error, Llamas' request during the instruction conference preserved this issue for appellate review. See *Ellmaker*, 289 Kan. at 1139 ("[T]he purpose of requiring an objection is to allow the district court to correct an error, if one occurred."). As to the second step, there is no dispute that the instruction was legally appropriate. We have stated that if a witness in a jury trial is an accomplice, " 'whether that [accomplice's] testimony is corroborated or not, the better practice is for the trial court to give a cautionary instruction. If the instruction is requested and is not given, the result may be error.' " *State v. Tapia*, 295 Kan. 978, 996, 287 P.3d 879 (2012) (quoting *State v. Moore*, 229 Kan. 73, 80, 622 P.2d 631 [1981]);

see PIK Crim. 3d 52.18, Notes on Use (better practice is to give this cautionary instruction regardless of whether there is corroborating evidence, as long as the accomplice is not also a codefendant in the trial).

The dispute in this appeal focuses on the next step of the analysis—whether the instruction was factually appropriate as to Ruby. This "naturally depends on whether the witness is an accomplice." *Tapia*, 295 Kan. at 996. In *Simmons*, we explained the meaning of an "accomplice witness," stating:

"PIK Crim. 3d 52.18 defines 'accomplice witness' as one who testifies that he or she was 'involved in the commission' of the defendant's charged crime. See *State v. Abel*, 261 Kan. 331, 336, 932 P.2d 952 (1997), *disapproved on other grounds State v. Mathenia*, 262 Kan. 890, Syl. ¶ 3, 942 P.2d 624 (1997). This is consistent with the general view which is that '[a] person is an "accomplice" of another in committing a crime if, with the intent to promote or facilitate the commission of the crime, he solicits, requests, or commands the other person to commit it, or aids the other person in planning or committing it.' 1 Torcia, Wharton's Criminal Law § 38, p. 220 (15th ed. 1993). Thus, the term refers to a wide range of persons who, at common law, were said to have primary or secondary liability—principals who are codefendants, accessories, conspirators, or aiders and abettors. However, although the term is often used inadvertently and without precision as a synonym for one of these categories of criminal actors, technically the term 'accomplice witness' applies only when one who has been involved in the commission of a crime is called to testify against another during the course of a trial. See 21 Am. Jur. 2d, Criminal Law § 205." *Simmons*, 282 Kan. at 737.

This court has also discussed when a witness is not an accomplice. As particularly applicable to the parties' arguments in this case, we have held that "mere presence during the planning or commission of a crime does not make one an accomplice." *Simmons*, 282 Kan. at 738 (the witnesses' mere presence during the planning stages, their failure to stop or report the crime, and their receipt of stolen goods without a prearranged plan did not make them accomplices); see, *e.g.*, *State v. Humphery*, 267 Kan. 45, 62-63, 978 P.2d 264 (1999) (witness was not an accomplice as contemplated by the jury instruction; she had sex with the victim and directed him to drive to the place where he was killed, but she had no involvement in the robbery or murder in any way). In addition, this court has specifically rejected the idea that "mere 'involvement

in events' makes a witness an accomplice within the meaning of PIK Crim. 3d 52.18. [Citation omitted.] Instead, the witness must have been *involved in the commission of the crime with which the defendant is charged.*" *State v. Davis*, 283 Kan. 569, 580, 158 P.3d 317 (2006); see *Davis*, 283 Kan. at 577-80 (although witness may have been involved with events after the murder, only evidence at trial regarding witness' whereabouts and involvement was offered by witness herself, who testified that she was not present at time of the murder; there was no evidence that she otherwise participated in the planning or commission of the murder, other than the events that occurred after the murder); *Gholston*, 272 Kan. at 618 (witness went with defendant to convenience store where shooting occurred, but witness never saw the gun in the car and never saw defendant get out of the car with the gun; thus, there was no evidence that witness had knowingly aided, associated, or participated in the crime); *cf. Tapia*, 295 Kan. at 996-97 (defendant was charged with the crime of burglary and the witness' admitted role as the driver and lookout for the burglary clearly placed him in the role of accomplice).

In this case, we agree with Llamas' argument that there was circumstantial evidence of Ruby's intent to aid and abet the completion of the crime when she relayed the information from Meyers to Navarro. There was evidence suggesting she knew Navarro planned to hunt down Flores and shoot him if he did not repay the money, part of which she had provided. Hence, it was legally and factually appropriate to have included Ruby in the accomplice instruction, and the failure to do so was error.

Because the trial court erred, we must determine whether the error was harmless. Llamas cites to the constitutional harmless error standard but does not argue how the error violated a constitutional right. "A point raised incidentally in a brief and not argued there is deemed abandoned." *State v. Holman*, 295 Kan. 116, 142, 284 P.3d 251 (2012). We, therefore, apply the nonconstitutional harmless error standard under which "the error is reversible only if we determine that there is a 'reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.' *Ward*, 292 Kan. at 569." *Plummer*, 295 Kan. at 168.

In determining whether the failure to give an accomplice instruction was reversible error, this court has examined the extent and importance of an accomplice's testimony, as well as any corroborating testimony. *Tapia,* 295 Kan. at 997; *State v. Simmons,* 282 Kan. 728, 740, 148 P.3d 525 (2006); see *State v. Moody,* 223 Kan. 699, 702, 576 P.2d 637 (failure to give accomplice instruction can create trial error, particularly when the accomplice testimony is uncorroborated), *cert. denied* 439 U.S. 894 (1978).

Here, Llamas argues that Ruby's assertions "were critical components" of the State's case because she placed Llamas at the scene of the confrontation near the restaurant and during times when Navarro was searching for Flores. He also points to Ruby's testimony that Llamas' cousin stole a gun from her house and argues the jury could have concluded that Llamas was armed with the stolen gun when Flores was shot.

None of these points is persuasive. While Ruby did testify to Llamas' presence at the restaurant and on occasions when Navarro searched for Flores, Michael and Meyers corroborated this in their testimony. Further, they testified that Navarro told many of his friends that he was angry about the drug transaction and that if Flores did not pay him, something was going to happen. They also corroborated Ruby's testimony that Navarro had threatened to kill Flores, although they testified that they did not believe Navarro would do so. In essence, Ruby's testimony about Llamas' role was corroborated by other witnesses. Finally, there was no forensic or other evidence suggesting there were two guns at the scene, and no evidence suggesting or implying that Llamas might have acquired the stolen gun from his cousin.

Based on our review of the entire record, we determine there is not a reasonable probability that the error affected the outcome of the trial. See *Plummer,* 295 Kan. at 168; *State v. Ward,* 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Affirmed.

* * *

JOHNSON, J., dissenting: The State's theory in prosecuting Sam-

uel D. Llamas for felony murder was founded upon a claim that Llamas aided and abetted Michael Ismael Navarro in committing the crime of discharging a firearm at an occupied motor vehicle, which resulted in the death of Omar Flores. In my view, the evidence was insufficient to establish that Navarro committed the underlying felony of criminal discharge of a firearm at an occupied motor vehicle, which would negate the notion that Llamas willingly participated in the commission of that crime, regardless of whatever assistance Llamas may have given Navarro with any other crimes he may have committed.

The majority's recitation of the facts establishes that Flores owed Navarro a drug debt and that Llamas had tried through nonviolent means to help Navarro collect that money. The most that the jury could have inferred from the evidence about the day of the shooting was that Llamas got into the passenger seat of Navarro's vehicle, observed the presence of a firearm, and understood that Navarro planned to use the weapon to either coerce Flores into paying his drug debt or do bodily harm to Flores. Nothing in the record even hints at the possibility that Llamas could have divined the idea that Navarro intended to use the rifle to shoot at or damage Flores' vehicle, much less that Llamas willingly participated in furthering such intentions. Moreover, notwithstanding the State's creative prosecutorial theory, the actual evidence presented at trial established that the firearm was discharged *at* Flores, not at his Suburban. There was no evidence that any of the multiple rounds discharged from Navarro's rifle struck the vehicle, while Flores suffered 11 gunshot wounds. The possibility that some of the rounds may have traveled through an open car window does not refute the clear fact that the weapon was aimed at and the rounds were intended to hit Flores' body, not his motor vehicle.

Granted, the majority can rely on *State v. Farmer*, 285 Kan. 541, 545-48, 175 P.3d 221 (2008), in which the majority opinion, authored by then Chief Justice McFarland, interpreted the crime defined in K.S.A. 21-4219(b)—discharge of a firearm at an occupied motor vehicle—to include the act of intentionally discharging a firearm at a specific person, so long as that person happened to be sitting inside a motor vehicle at the time of the shooting. But

as the dissent in *Farmer* pointed out, that interpretation contradicts both the plain and unambiguous language of the statute and the obvious purpose of the statute as revealed in its legislative history. 285 Kan. at 556-58 (Beier, J., dissenting).

The facts in *Farmer* are closely analogous to the facts in this case with respect to the issue at hand, making the statutory construction analysis in the *Farmer* dissent uncannily germane here:

"The crime at issue requires 'discharge of a firearm at an occupied . . . motor vehicle.' K.S.A. 2006 Supp. 21-4219(b). The phrase, 'at [a] . . . motor vehicle,' does not look or sound ambiguous to me. Shooting at a motor vehicle is one thing; shooting at a person is something else. Regardless of whether the State's or the defendant's version of events is relied upon here, [the defendant] shot only at [the victim]. Evidence of where [the defendant] may have been standing when he fired, of where [the victim] may have been sitting when he was hit, or of where two shell casings may have fallen after being ejected from [the defendant's] weapon, is interesting but not determinative." 285 Kan. at 556 (Beier, J., dissenting).

The *Farmer* dissent went on to explain that even if one could manufacture an ambiguity in the statutory provision that would permit us to review legislative history, the result would be the same. The specific purpose of the law was to create a felony offense that would apply to drive-by shootings " 'when aggravated assault and aggravated battery fail[] to cover the act' " because the victim was " 'not placed in immediate apprehension of bodily harm' " or " 'the requisite intent to injure, required for battery, cannot be shown.' " 285 Kan. at 556-57 (quoting Report of Subcommittee, House Judiciary Committee on Drive-by Shooting [H.B. 2709], February 25, 1992). Therefore, holding that the crime of discharging a firearm at an occupied motor vehicle encompasses the situation where the State's evidence has shown all of the elements of aggravated battery—including the requisite intent to injure a specific person—flies in the face of the statute's legislative history and defies our most fundamental rule of statutory construction. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010) (most fundamental rule of statutory construction is that intent of legislature governs if that intent can be ascertained).

Today, I would also offer the rule of lenity as yet another well-established reason to reject the *Farmer* holding. The rule of lenity

is a general rule of statutory construction whereby criminal statutes are strictly construed in favor of the accused, which means that "[a]ny reasonable doubt as to the meaning of the statute is decided in favor of the accused." *State v. Coman*, 294 Kan. 84, 96, 273 P.3d 701 (2012). In fact, if the statutory interpretation favoring the accused is reasonable and sensible, this court is *required* to utilize that interpretation. See *Coman*, 294 Kan. at 97 (if "there are two reasonable and sensible interpretations of a criminal statute, the rule of lenity requires the court to interpret its meaning in favor of the accused"). I would submit that the *Farmer* majority's interpretation of K.S.A. 21-4219(b) was *not* reasonable and sensible in its own right, and it certainly was not the only available reasonable and sensible interpretation. By giving the criminal statute an expansive reading, the *Farmer* majority interpreted it in favor of the State, not the accused, and effectively saved a felony-murder conviction that was not proved as charged.

I would not replicate *Farmer*'s result-oriented mistake here. To the contrary, I would overrule *Farmer* in the same manner as we have recently done with other prior decisions that we found to be unacceptably contrary to the applicable statutory provisions. See, *e.g.*, *State v. Berry*, 292 Kan. 493, 512-14, 254 P.3d 1276 (2011) (overruling decades-old court-made special rule for lesser included offense instructions on felony murder in favor of applying K.S.A. 22-3414[3] as written); *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 609-10, 214 P.3d 676 (2009) (overruling string of cases that imposed good-faith effort requirement for work disability as being contrary to plain language of K.S.A. 44-510e[a]); *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 525-28, 154 P.3d 494 (2007) (overruling 76-year-old parallel injury rule as being contrary to workers compensation statutes).

Finally, regardless of whether the crime is defined as shooting at the car or shooting at the person, I discern that the evidence is insufficient to support that Llamas aided and abetted in the commission of that crime. Rather, the only reasonable inference to be drawn from the evidence is that Llamas formed the intent to drive the getaway car *after* Navarro shot Flores, which would constitute the crime of aiding a felon, pursuant to K.S.A. 21-3812(a). Aiding

a felon is a crime separate and distinct from the offense committed by the person receiving the aid. Consequently, given that Llamas' act of driving the getaway vehicle is irrelevant to the charged crime, I would find that the remaining evidence is too thin and speculative to support a conviction for aiding and abetting Navarro's criminal enterprise. See *State v. Spear*, 297 Kan. 780, 791, 304 P.3d 1246 (2013) ("many courts have observed that '[a] guess is not proof beyond a reasonable doubt' " [quoting *United States v. Spirk*, 503 F.3d 619, 612 (7th Cir. 2007)]). I would reverse Llamas' convictions for insufficient evidence.

BEIER and MORITZ, JJ., join in the foregoing dissent.