IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,315

STATE OF KANSAS,
*Appellee*,

v.

BRENT J. CARTER,
*Appellant*.

SYLLABUS BY THE COURT

1.

A jury instruction must be both legally and factually appropriate. An instruction on the defendant's theory of defense is factually appropriate if there is sufficient evidence, when viewed in the light most favorable to the defendant, for a rational fact-finder to find for the defendant on that theory.

2.

Under K.S.A. 22-3203, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint under K.S.A. 22-3202(1).

3.

K.S.A. 22-3202(1) permits joining multiple charges in a single complaint if the charges: (1) are of the same or similar character; (2) are part of the same act or transaction; or (3) result from two or more acts or transactions connected together or constituting parts of a common scheme or plan.

1

4.

For the purposes of K.S.A. 22-3202(1), charges are connected together when: (1) a defendant provides evidence of one crime while committing another; (2) some of the charges are precipitated by the other charges; or (3) all of the charges stem from a common event or goal.

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed July 10, 2020. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett,* district attorney, and *Derek Schmidt,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: A jury convicted Brent J. Carter of two counts of first-degree felony murder, two counts of criminal discharge of a firearm, one count of aggravated battery, and one count of criminal threat. The battery and threat charges arose out of an incident in which Carter hit and threatened to kill Tatyana Crowe. The murder and criminal discharge of a firearm charges arose out of a shooting at a house in Wichita, Kansas, that resulted in the deaths of Betty Ann Holloman and Brenton Oliver. On appeal, Carter argues the district court erred by declining to give his requested instruction clarifying the definition of aiding and abetting. He also argues the court erred in granting the State's motion to consolidate his charges for trial. Finding no error, we affirm Carter's convictions.

FACTS

In late 2015, Brent Carter, a member of the Gangster Disciples street gang, was in a relationship with Crowe. By November of that year, Crowe was pregnant with Carter's child. Around that time, Crowe started talking and texting with Magic Jamerson. Jamerson was a member of the Bloods street gang, a known rival of the Gangster Disciples.

On November 23, 2015, Carter, Crowe, Khalah Beard, and Brenton Oliver were together at an abandoned house when Jamerson showed up. Jamerson said he learned that night that Carter and Crowe were in a relationship, and he told Carter he had talked to Crowe a few days ago. Carter asked Crowe to come outside with him. Once outside, Carter pushed Crowe up against a car and started hitting her. He head-butted her and choked her. He accused Crowe of sleeping with Jamerson, which she denied. Crowe eventually broke free, but Carter caught her, threw her to the ground, and kicked her in the stomach. Crowe escaped again and managed to run across the street. Carter yelled after her, saying "I'm going to kill you and that baby." Crowe initially told police Jamerson had helped to pull Carter off her, but at trial neither Crowe nor Jamerson could remember this happening.

After this incident, Crowe ended her relationship with Carter and pursued a relationship with Jamerson. Sometime in the following week, Jamerson heard Carter was planning to kill him. Jamerson confronted Carter, but Carter did not want to talk and appeared to have resolved any continuing animosity toward Jamerson. However, Carter later told Crowe he was not going to fight Jamerson but shoot him instead.

On December 1, 2015, Crowe was at the home of her friend, Luerene Browning. Browning lived with her mother, Betty Ann Holloman, and her stepfather, John Collins,

3

in a house on Mossman Street in Wichita. Jamerson and Oliver came over to visit Crowe and Browning that day.

At some point, Jamion Wimbley pulled up to the house in his car to drop off Beard. Oliver came out of the house and approached Wimbley's car, yelling. Wimbley, a member of the Gangster Disciples, and Oliver, a member of the Bloods, had been in a physical fight about two weeks earlier. While Wimbley and Oliver were arguing, Jamerson came outside and yelled "on Bloods." A gang expert with the Wichita Police Department later testified that the term "on Bloods" was used to represent one's gang and told others "if you're going to bring it, bring it on, let's do it." Wimbley ultimately left, but before he drove off, he told Oliver, "I've got something for your bitch ass. I'll be right back."

After Wimbley left, Beard got into an argument with Jamerson. She then called her sister, Alexis Davis, to come pick her up. Davis' boyfriend, Jonathan Carter, drove Davis over to the Mossman house in his car. He parked his car with the passenger side closest to the house. Another of Beard's sisters, Desanik Reese, and Beard's one-year-old nephew were also in the car with Jonathan and Davis.

Davis saw Jamerson "talking stuff" to Beard and became upset. She got out of Jonathan's car and got into an argument with Jamerson. Jamerson slapped her for her apparent disrespect of his gang. Oliver then approached Jonathan, who was standing in the street beside the driver's side door of his car. Jonathan, like Carter and Wimbley, was associated with the Gangster Disciples. Jonathan and Oliver then got into a physical altercation.

Collins testified Jamerson rushed Jonathan's car during the fight and then shots rang out. Jamerson could not remember if he joined the fight between Jonathan and

4

Oliver. But, he remembered shots being fired "from up under" Jonathan, and he believed Jonathan had fired the shots.

Wimbley's car then came down the street, with the driver's side closest to the house. Most witnesses agreed that Wimbley was driving and Quincy "Q-Ball" Carter, a member of a gang aligned with the Gangster Disciples, was in the seat behind the driver's seat. Shots were being fired from Wimbley's car. When the car stopped, Wimbley jumped out and joined the fight between Jonathan and Oliver.

A third person was also in the car with Wimbley and Quincy. While Reese was unable to identify this third person, several other witnesses testified it was Carter. Browning, Jamerson, Davis, and Collins all testified they saw Carter in Wimbley's car holding a long gun, and three of those witnesses testified they saw him firing the gun. Beard also originally told detectives she saw Carter with a gun. Most of these witnesses placed Carter in the passenger seat of Wimbley's car, but Collins thought Carter was in the seat behind the driver's seat.

Jamerson testified Carter got out of Wimbley's car and ran in Jamerson's direction. Carter fired one or two shots at Jamerson. A bullet grazed Jamerson before he was able to run behind a car parked in the driveway.

Crowe, who had run to the back room of the house when Wimbley's car pulled up, said she heard Carter yell "Q-Ball, get back in the car" near the end of the shooting. She also told detectives she had seen Carter jump out of the passenger's seat of Wimbley's car, but at trial she denied seeing this.

Once the shooting was over, Jonathan, Wimbley, Quincy, and Carter all left the scene. By then, Holloman was lying on the floor of the living room in her home. She had sustained a gunshot wound to the neck and died at the scene. Oliver was lying on the

5

kitchen floor, trying to breathe. He had sustained multiple gunshot wounds. He was transported to the hospital but ultimately died of his injuries.

Officers recovered .22 caliber casings, .38 caliber casings, .40 caliber casings, and .45 caliber casings from the scene of the shooting. During their investigation, the police also recovered four firearms, including a .22 caliber handgun found in Jonathan's car and a sawed-off .22 caliber rifle in Wimbley's car.

The State charged Carter with aggravated battery and criminal threat arising out of the November 23, 2015 incident. It also charged Carter with one count of criminal discharge of a firearm at an occupied dwelling, one count of criminal discharge of a firearm at an occupied vehicle, aggravated robbery, and two counts of first-degree felony murder arising from the shooting. Before trial, the State moved to consolidate the two cases, arguing the charges were connected by a common scheme or plan or had the same, or similar, character. After a hearing, the district court granted the motion, finding the charges were connected.

At trial, Beard testified she did not see Carter at the shooting. When confronted with her statement to police, she changed her testimony, saying Carter was in the passenger seat of Wimbley's car. She said she saw Carter get out of the car, but she denied seeing him with a gun. She claimed she told detectives Carter had a gun based on information she had gotten from Browning. But Browning testified she did not talk to anyone at the scene about what happened before being interviewed by police.

Crowe and Beard both testified Carter owned a sawed-off rifle. Crowe identified the sawed-off rifle found in Wimbley's car as belonging to Carter. But Browning did not recognize that rifle as the firearm she saw Carter holding during the shooting.

6

A ballistics expert opined that at least four firearms were used in the shooting. Testing linked some of the .22 caliber casings to the gun found in Jonathan's car. The other recovered firearms could not be linked to the other casings. The expert also testified that the sawed-off rifle recovered by police had a broken extractor, meaning the casings had to be manually removed each time the gun was fired.

A detective also testified regarding Jonathan's statement to law enforcement. According to the detective, Jonathan said he drove over to the Mossman house on the day of the shooting with a gun. He said he did not normally carry a gun with him, but Wimbley had been calling him. Once at the house, he got into a fight with Oliver, but he did not pull out his gun until he heard the shots coming from Wimbley's car. Jonathan said he got shot, but he was not shot by Oliver or Jamerson because neither of them had a gun. He then told the guys in Wimbley's car to stop shooting until he could separate himself from Oliver. The shooting temporarily stopped. Jonathan then started shooting at Oliver as Oliver ran toward the house.

The jury convicted Carter on all counts and found the battery and criminal threat counts were both acts of domestic violence. The district court sentenced him to two lifetime prison sentences without the possibility of parole for 25 years, plus 27 months' imprisonment, all to run consecutive. Carter appeals.

ANALYSIS

*Jury Instruction on Aiding and Abetting*

The first issue on appeal is Carter's challenge to the jury instruction on aiding and abetting. The jury instructions allowed the jury to convict Carter of the charges of criminal discharge of a firearm as either a principal or an aider and abettor. Carter's theory of defense at trial was that he was present at the scene of the shooting, but he did

7

not act in a way to ensure its success. As a result, he requested a jury instruction clarifying the definition of aiding and abetting.

At the instructions conference, the State asserted Carter was "essentially" asking the district court to add "mere presence language." The State was apparently referring to language stating the well-established rule that the defendant's mere presence during a crime or mere association with the principal alone does not establish the mental culpability necessary to convict under an aiding and abetting theory. See *State v. Llamas*, 298 Kan. 246, 253, 311 P.3d 399 (2013). The State argued any additional language on mere presence was not warranted here because no evidence supported a finding that Carter was merely present. It noted the witnesses had either testified that Carter had gotten out of Wimbley's car with a gun or that they had not seen Carter at all.

The district court ultimately denied Carter's request. It acknowledged it is best to include the mere presence language when the facts support it. See *Llamas*, 298 Kan. 246, Syl. ¶ 4. But it held any additional language about mere presence would not be appropriate here because none of the witnesses placed Carter at the scene without a gun in his hand. Instead, the court gave the standard instruction on aiding and abetting, based on PIK Crim. 4th 52.140, which states: "As to [the charges for criminal discharge of a firearm], a person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime."

On appeal, Carter argues the district court erred by declining to give the additional language about mere presence. When analyzing jury instruction issues, we use a four-step process:

> """(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2)

next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012)." [Citation omitted.]'" *State v. Murrin*, 309 Kan. 385, 391, 435 P.3d 1126 (2019).

As for the first step of this analysis, Carter did not specifically include the language about mere presence in his proposed instruction. Instead, he requested this instruction: "In order to be guilty of aiding and abetting, a defendant must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would something he wishes to bring about to make succeed." But the State and the district court interpreted Carter's request as a request for additional language about mere presence or association, and the court specifically referenced the optional language on mere presence included in PIK Crim. 4th 52.140. Defense counsel also argued at the instructions conference that "mere presence alone or the language which is selected in this jury instruction would be appropriate." For this reason, both parties agree that this issue is preserved for appeal.

As for the next step of the analysis, we must consider whether Carter's requested language was legally appropriate. Carter is correct that the additional language on mere presence is a correct statement of Kansas law. See, e.g., *Llamas*, 298 Kan. at 253; *State v. Edwards*, 291 Kan. 532, 551-52, 243 P.3d 683 (2010). Nevertheless, this court has repeatedly held the standard aiding and abetting instruction suffices because "'[j]uries are presumed to intuit from the word 'intentionally' in the patterned instruction that proof of mere association or presence would be insufficient to convict.'" *Llamas*, 298 Kan. at 260 (quoting *Edwards*, 291 Kan. at 552).

9

While the standard jury instruction generally suffices, Carter highlights decisions in which this court has recommended inclusion of the additional language on mere presence. For instance, in *State v. Hilt*, 299 Kan. 176, 185-86, 322 P.3d 367 (2014), we stated the "better practice" is to include such language and "failure to do so may imperil convictions in future similar cases." Carter asks us to convert this "better practice" into a legal requirement in cases where the defendant is charged under an aiding and abetting theory and requests the instruction.

In support of his argument, Carter cites *Llamas*. There, the defendant claimed he was simply present in his codefendant's car when the codefendant shot at another car. The district court denied the defendant's request for a jury instruction including the mere presence language. The jury later asked for a clarification of each criminal charge in "layman's" terms and for a "definition" of aiding and abetting. 298 Kan. at 259. On appeal, the defendant argued the district court committed reversible error by failing to give the requested instruction, and the jury's question showed the jury was confused. In rejecting the defendant's argument, we explained the jury's questions "[did] not suggest that the jurors were confused about the focus of this issue—that [defendant] had to intentionally act in a manner that aided and abetted [the principal's] criminal discharge of a firearm at an occupied vehicle." 298 Kan. at 261.

Carter notes that, like in *Llamas*, the jury in his case also asked a question. During deliberation, the jury asked the district court, "Does the discharge of Brent Carter's firearm need to be confirmed as ONLY his firearm or any firearm at the scene?" He claims this question was essentially a request for clarification on the definition of aiding and abetting. He asserts the jury's question raises doubts about whether the verdict was based on a correct understanding of the law. Referring to *Llamas*, he reasons that jury questions about the definition of aiding and abetting appear to be a reoccurring issue, so the best course of action would be for this court to require district courts to include the mere presence language in aiding and abetting instructions.

10

Looking at the jury's question in context, though, we do not find it suggests the jury was confused about the law on aiding and abetting. The jury's full question is as follows: "Under instruction 5 #2. Does the discharge of Brent Carter's firearm need to be confirmed as ONLY his firearm or any firearm at the scene? It is not stipulated under #5 as it is on other instructions. —This also applies to #7."

Instructions 5 and 7 laid out the elements of felony murder based on criminal discharge of a firearm. In both instructions, the second element states: "the killing was done while Brent Carter was committing criminal discharge of a firearm" at an occupied motor vehicle or at an occupied dwelling.

Instructions 6 and 8 laid out the elements of criminal discharge of a firearm. The first two elements in those instructions state:

> "1. Brent Carter, *or another for whose conduct he is criminally responsible*, discharged a firearm at [a motor vehicle or dwelling]."

> "2. Brent Carter, *or another for whose conduct he is criminally responsible*, did so recklessly and without authority." (Emphasis added.)

Comparing these instructions, the listed elements of Instructions 6 and 8 clearly state Carter may be found guilty on an aiding and abetting theory, but the listed elements of Instructions 5 and 7 do not. Thus, the jury question does not appear to demonstrate confusion about what the State needed to prove to convict Carter on an aiding and abetting theory. Instead, the question appears to show the jury was unclear on whether Carter could be convicted of felony murder if he was guilty of criminal discharge of a firearm as an aider or abettor and not a principal. As a result, the jury's question does not suggest its verdict was based on an incorrect understanding of the law on aiding and abetting. Nor, does it indicate an ongoing problem with the standard aiding and abetting instruction which would mandate addition of the mere presence language.

11

For its part, the State argues that the touchstone here is not whether the requested language was legally appropriate but whether it was factually appropriate. Generally, an instruction on the defendant's theory of defense is factually appropriate if there is sufficient evidence, when viewed in the light most favorable to the defendant, for a rational fact-finder to find for the defendant on that theory. *Murrin*, 309 Kan. at 391. Here, the district court held the instruction was not factually appropriate because no one testified that Carter was at the scene without a gun.

Strictly speaking, the district court's finding is incorrect. In arguing the requested language was factually appropriate, Carter relies primarily on Beard's testimony. Beard originally told police she saw Carter at the scene with a gun. At trial, she first testified she did not see Carter at all. She then changed her testimony to say she saw Carter get out of the passenger seat, but she denied seeing him with a gun. In fact, she testified she did not see him do anything. Resolving these evidentiary conflicts in Carter's favor, Beard provided evidence that Carter was at the scene but was not actively doing anything to assist the shooting. Thus, there appears to be at least a modicum of evidence to support his theory.

But regardless of whether this testimony was enough to allow a rational fact-finder to find for Carter on his defense theory, any possible error in failing to give Carter's requested instruction was harmless. Carter argues there is a reasonable probability the verdict would have been different if the instruction had been given, but we disagree. See *State v. McCullough*, 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012). This is not a case in which the State produced little evidence of the defendant's direct participation in the crime. Trial testimony shows that the night before the shooting, Carter told Crowe he was going to shoot Jamerson. The next day, Wimbley left the Mossman house, threatening to come back with something for Oliver. Less than an hour later, Wimbley returned with Carter and Quincy in his car. Four witnesses testified they saw Carter with a gun, and they all identified it as a long gun. Three of those witnesses also testified they saw Carter

12

shooting. This evidence would show that Carter was not just intentionally aiding the crime but was directly involved in its commission.

Beard also originally told police she saw Carter with a gun. While at trial she claimed she only told police what Browning had told her, Browning denied telling her anything. Beard also changed her version of events twice, including once while she was on the stand. The jurors clearly did not find Beard credible, and they convicted Carter. Given the weight of the evidence supporting Carter's guilt, there is simply no reasonable probability that the outcome would have been any different had the district court given Carter's requested instruction.

*State's Motion to Consolidate*

Next, Carter argues the district court erred in granting the State's motion to consolidate. We review potential consolidation errors using a three-step analysis, applying a different standard of review at each step. First, we determine whether K.S.A. 22-3203 permits consolidation. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) sets out the conditions under which multiple crimes may be joined in a single complaint. Whether one of these conditions is satisfied is a fact-specific inquiry, and we review the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. *State v. Smith-Parker*, 301 Kan. 132, 156, 340 P.3d 485 (2014).

Second, because K.S.A. 22-3202 provides that the district court "may" order charges joined together, the court retains discretion to deny a consolidation request even if a statutory condition is met. See also K.S.A. 22-3203 (district court "may" order

13

multiple complaints against a single defendant tried together). We review this decision for an abuse of discretion. *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013).

Finally, if an error occurred in the preceding steps, we determine whether the error resulted in prejudice—that is, whether the error affected a party's substantial rights. K.S.A. 2019 Supp. 60-261; *Hurd*, 298 Kan. at 561.

First, we must determine if substantial competent evidence supports the district court's determination that one of the conditions listed in K.S.A. 22-3202 was met. K.S.A. 22-3202(1) establishes the three conditions permitting the joining of multiple crimes in a single complaint:  (1) the charges are of the "same or similar character"; (2) the charges are part of the "same act or transaction"; or (3) the charges result from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Here, the district court found the two complaints could be consolidated for trial because the charges were connected together. See K.S.A. 22-3202(3). We have broadly construed the phrase "connected together" to apply in three situations:  (1) when a defendant provides evidence of one crime while committing another; (2) when some of the charges are precipitated by the other charges; or (3) when all of the charges stem from a common event or goal. *State v. Donaldson*, 279 Kan. 694, 699, 112 P.3d 99 (2005).

The State argued in its motion that the charges were connected because the battery helped to explain Carter's motive to participate in the shooting. In its ruling, the district court noted the State did not specify which of the three situations identified in *Donaldson* were present here, but the court found the battery precipitated the shooting. The court explained the common meaning of precipitate was "to cause, instigate, to trigger, to accelerate or even to expediate." According to the court, the battery "appears to have either started, instigated or accelerated" Carter's motivation to participate in the shooting.

The district court made extensive fact-findings to support its conclusion: (1) both incidents were related to a gang rivalry; (2) a gang expert testified women are a common source of individual incidents in the rivalry between Bloods and Gangster Disciples because women will go back and forth between members of the different gangs; (3) Jamerson was present at the battery and pulled Carter off Crowe; (4) Crowe decided to end her relationship with Carter and pursue a relationship with Jamerson after the battery; (5) despite the end of their relationship, Crowe continued to have contact with Carter, and Carter allegedly told her he was going to shoot Jamerson the night before the shooting; (6) Jamerson was with Oliver, a fellow Blood, at the Mossman house on the day of the shooting; (7) Wimbley, a Gangster Disciple, got in an argument with Oliver at the Mossman house; (8) after the argument, Wimbley left to pick up Carter, a Gangster Disciple, and Quincy, a member of a gang allied with the Gangster Disciples; (9) most of the gunshots were aimed at Oliver, but at least one shot grazed Jamerson; (10) Carter told police Oliver was like a brother, even though they were in different gangs; and (11) Carter also told police Crowe would have been motivated to lie about his involvement in the shooting because she was angry about the battery.

The district court concluded the battery and threat against Crowe started a series of events that culminated in the shooting. It held the battery was necessary to explain Crowe's decision to end her relationship with Carter and pursue a relationship with Jamerson, a rival gang member. It was also necessary to help explain Carter's involvement in the shooting, since he presumably would not have wanted to shoot his friend Oliver. Furthermore, Carter claimed the battery was the reason Crowe was placing him at the scene of the shooting.

Carter argues the district court erred in finding the battery precipitated the shooting at the Mossman house. In contesting the district court's fact-findings, Carter focuses on the trial testimony of Crowe and Jamerson. He notes Crowe testified at trial that Jamerson did not do anything to stop Carter during the battery. Jamerson also denied

15

helping Crowe and denied having a sexual relationship with Crowe at the time. Jamerson also testified he did not feel any legitimate threat to his safety before the shooting.

Carter's argument has two weaknesses. First, the district court ruled on the State's consolidation motion before trial and thus was relying on proffered evidence, not trial testimony. The proffered evidence included Crowe's statement to police that Jamerson had pulled Carter off her during the battery. Second, none of the cited testimony undermines the district court's ultimate conclusion. Even if Jamerson did not have a sexual relationship with Crowe, the evidence shows Carter suspected that they did. And even if Jamerson did not try to stop the battery, Crowe still ended her relationship with Carter afterwards and pursued a relationship with Jamerson. Finally, Jamerson's lack of concern for his safety does not mean Carter's threats to shoot or kill Jamerson were not serious. On the contrary, Carter's participation in the shooting would suggest that he was, in fact, very serious.

Carter also challenges the district court's legal conclusion. He argues the battery did not precipitate the shooting because it not directly motivate the shooting. For support, he cites two cases in which this court held charges were properly consolidated for trial under this factor.

In *State v. Pondexter*, 234 Kan. 208, 216-17, 671 P.2d 539 (1983), the defendant was convicted of aggravated assault of a law enforcement officer, unlawful possession of a firearm, burglary, and attempted murder. The defendant's charges for burglary and attempted murder arose out of the defendant's attempt to kill an undercover officer who was going to testify at the defendant's trial for assault and unlawful possession of a firearm. On appeal, the defendant argued the district court had erred in consolidating all the charges for trial. This court disagreed. We noted the defendant wanted to kill the undercover officer to prevent him from testifying at his trial for aggravated assault and unlawful possession of a firearm. We concluded, "Clearly the crimes charged in the

16

earlier action precipitated the conduct resulting in the attempted murder and burglary charges," thus the charges were properly consolidated for trial. 234 Kan. at 216-17.

In *State v. Dreiling*, 274 Kan. 518, 54 P.3d 475 (2002), the defendant was convicted of first-degree premeditated murder, conspiracy to commit murder, terroristic threat, and conspiracy to commit perjury. The defendant argued his perjury charge should have been tried separately from the murder charges. This court, again, disagreed. We found the charges were connected together because the perjury would have concealed evidence of the defendant's motive for murder. 274 Kan. at 555.

Carter argues that in *Pondexter* and *Dreiling* the second crimes were caused or motivated by the first crimes. In those cases, the defendant committed a second crime to conceal evidence of the first crime. Carter claims the State did not present evidence that the battery directly motivated the shooting in the same way.

In another decision, though, this court found charges were properly consolidated under this factor in a factual situation more analogous to the present case. In *State v. Walker*, 244 Kan. 275, 768 P.2d 290 (1989), the defendant was convicted of two counts of aggravated criminal sodomy and two counts of endangering a child, based on her abuse of her two stepsons. She was also convicted of one count of making a terroristic threat. The threat charge arose out of comments she made to a hospital social worker who would not allow the defendant to visit one of the victims after he had been admitted to a psychiatric hospital. The defendant argued the district court erred in consolidating the threat charge with the charges involving abuse of her stepsons.

On review, we affirmed the district court's decision to consolidate the charges. We acknowledged that the charges in cases such as *Pondexter* were more directly connected. Even so, we concluded the threat charges resulted from the original charges of child abuse and endangering a child. We explained, "The earlier charges precipitated the

17

factual setting which led appellant to make the threat against [the social worker.]" 244 Kan. at 279-80.

The charges in *Dreiling* and *Pondexter* may have been more directly connected than Carter's charges. But, like in *Walker*, the battery against Crowe precipitated the factual setting which led to Carter's participation in the shooting. Because of the battery, Crowe ended her relationship with Carter and pursued a relationship with Jamerson. This motivated Carter to want to harm Jamerson, thus precipitating the shooting. As a result, the district court did not err in finding this condition was met.

As for the second step of the analysis, we must determine whether the district court abused its discretion. Carter does not provide a specific argument on this point. The district court made a comprehensive ruling from the bench with extensive fact-findings, and Carter has not identified any errors of fact or law in this ruling. Moreover, a reasonable person could agree with the court's decision to consolidate the cases. Thus, we find the district court did not abuse its discretion in consolidating Carter's charges for trial.

Finally, because the district court correctly found a statutory condition for consolidation was met, and the court did not abuse its discretion in allowing consolidation, Carter has failed to show any error in the court's ruling. Thus, we need not reach the third step of the analysis to determine whether any error was harmless.

Affirmed.

MICHAEL E. WARD, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 119,315 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.